*530 Justice Scalia
delivered the opinion of the Court.
Under the Mobile-Sierra doctrine, the Federal Energy Regulatory Commission (FERC or Commission) must presume that the rate set out in a freely negotiated wholesale-energy contract meets the “just and reasonable” requirement imposed by law. The presumption may be overcome only if FERC concludes that the contract seriously harms the public interest. These cases present two questions *531 about the scope of the Mobile-Sierra doctrine: First, does the presumption apply only when FERC has had an initial opportunity to review a contract rate without the presumption? Second, does the presumption impose as high a bar to challenges by purchasers of wholesale electricity as it does to challenges by sellers?
I
A
Statutory Background
The Federal Power Act (FPA), 41 Stat. 1063, as amended, gives the Commission[1] the authority to regulate the sale of electricity in interstate commerce—a market historically characterized by natural monopoly and therefore subject to abuses of market power. See 16 U. S. C. § 824 et seq. (2000 ed. and Supp. V). Modeled on the Interstate Commerce Act, the FPA requires regulated utilities to file compilations of their rate schedules, or “tariffs,” with the Commission, and to provide service to electricity purchasers on the terms and prices there set forth. §824d(e). Utilities wishing to change their tariffs must notify the Commission 60 days before the change is to go into effect. §824d(d). Unlike the Interstate Commerce Act, however, the FPA also permits utilities to set rates with individual electricity purchasers through bilateral contracts. § 824d(e), (d). As we have explained elsewhere, the FPA “departed from the scheme of purely tariff-based regulation and acknowledged that contracts between commercial buyers and sellers could be used in ratesetting.” Verizon Communications Inc. v. FCC, 535 U. S. 467, 479 (2002). Like tariffs, contracts must be filed with the Commission before they go into effect. 16 U. S. C. § 824d(c), (d).
The FPA requires all wholesale-electricity rates to be “just and reasonable.” § 824d(a). When a utility files a new *532 rate with the Commission, through a change to its tariff or a new contract, the Commission may suspend the rate for up to five months while it investigates whether the rate is just and reasonable. § 824d(e). The Commission may, however, decline to investigate and permit the rate to go into effect— which does not amount to a determination that the rate is “just and reasonable.” See 18 CFR §35.4 (2007). After a rate goes into effect, whether or not the Commission deemed it just and reasonable when filed, the Commission may conclude, in response to a complaint or on its own motion, that the rate is not just and reasonable and replace it with a lawful rate. 16 U. S. C. § 824e(a) (2000 ed., Supp. V).
The statutory requirement that rates be “just and reasonable” is obviously incapable of precise judicial definition, and we afford great deference to the Commission in its rate decisions. See FPC v. Texaco Inc., 417 U. S. 380, 389 (1974); Permian Basin Area Rate Cases, 390 U. S. 747, 767 (1968). We have repeatedly emphasized that the Commission is not bound to any one ratemaking formula. See Mobil Oil Exploration & Producing Southeast, Inc. v. United Distribution Cos., 498 U. S. 211, 224 (1991); Permian Basin, supra, at 776-777. But FERC must choose a method that entails an appropriate “balancing of the investor and the consumer interests.” FPC v. Hope Natural Gas Co., 320 U. S. 591, 603 (1944). In exercising its broad discretion, the Commission traditionally reviewed and set tariff rates under the “cost-of-service” method, which ensures that a seller of electricity recovers its' costs plus a rate of return sufficient to attract necessary capital. See J. McGrew, Federal Energy Regulatory Commission 152, 160-161 (2003) (hereinafter McGrew).
In two cases decided on the same day in 1956, we addressed the authority of the Commission to modify rates set bilaterally by contract rather than unilaterally by tariff. In United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U. S. 332, we rejected a natural-gas utility’s argument that *533 the Natural Gas Act’s requirement that it file all new rates with the Commission authorized it to abrogate a lawful contract with a purchaser simply by filing a new tariff, see id., at 336-337. The filing requirement, we explained, is merely a precondition to changing a rate, not an authorization to change rates in violation of a lawful contract (i. e., a contract that sets a just and reasonable rate). See id., at 339-344.
In FPC v. Sierra Pacific Power Co., 350 U. S. 348, 352-353 (1956), we applied the holding of Mobile to the analogous provisions of the FPA, concluding that the complaining utility could not supersede a contract rate simply by filing a new tariff. In Sierra, however, the Commission had concluded not only (contrary to our holding) that the newly filed tariff superseded the contract, but also that the contract rate itself was not just and reasonable, “solely because it yield[ed] less than a fair return on the net invested capital” of the utility. 350 U. S., at 355. Thus, we were confronted with the question of how the Commission may evaluate whether a contract rate is just and reasonable.
We answered that question in the following way:
“[T]he Commission’s conclusion appears on its face to be based on an erroneous standard. . . . [W]hile it may be that the Commission may not normally impose upon a public utility a rate which would produce less than a fair return, it does not follow that the public utility may not itself agree by contract to a rate affording less than a fair return or that, if it does so, it is entitled to be relieved of its improvident bargain. ... In such circumstances the sole concern of the Commission would seem to be whether the rate is so low as to adversely affect the public interest — as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory.” Id., at 354-355 (emphasis deleted).
*534 As we said in a later case, “[t]he regulatory system created by the [FPA] is premised on contractual agreements voluntarily devised by the regulated companies; it contemplates abrogation of these agreements only in circumstances of unequivocal public necessity.” Permian Basin, supra, at 822.
Over the past 50 years, decisions of this Court and the Courts of Appeals have refined the Mobile-Sierra presumption to allow greater freedom of contract. In United Gas Pipe Line Co. v. Memphis Light, Gas and Water Div., 358 U. S. 103, 110-113 (1958), we held that parties could contract out of the Mobile-Sierra presumption by specifying in their contracts that a new rate filed with the Commission would supersede the contract rate. Courts of Appeals have held that contracting parties may also agree to a middle option between Mobile-Sierra and Memphis Light: A contract that does not allow the seller to supersede the contract rate by filing a new rate may nonetheless permit the Commission to set aside the contract rate if it results in an unfair rate of return, not just if it violates the public interest. See, e. g., Papago Tribal Util. Auth. v. FERC, 723 F. 2d 950, 953 (CADC 1983); Louisiana Power & Light Co. v. FERC, 587 F. 2d 671, 675-676 (CA5 1979). Thus, as the Mobile-Sierra doctrine has developed, regulated parties have retained broad authority to specify whether FERC can review a contract rate solely for whether it violates the public interest or also for whether it results in an unfair rate of return. But the Mobile-Sierra presumption remains the default rule.
Moreover, even though the challenges in Mobile and Sierra were brought by sellers, lower courts have concluded that the Mobile-Sierra presumption also applies where a purchaser, rather than a seller, asks FERC to modify a contract. See Potomac Elec. Power Co. v. FERC, 210 F. 3d 403, 404-405, 409-410 (CADC 2000); Boston Edison Co. v. FERC, 856 F. 2d 361, 372 (CA1 1988). This Court has seemingly blessed that conclusion, explaining that under the FPA, “[w]hen commercial parties . . . avail themselves of rate *535 agreements, the principal regulatory responsibility [is] not to relieve a contracting party of an unreasonable rate.” Verizon, 535 U. S., at 479 (citing Sierra, supra, at 355).
Over the years, the Commission began to refer to the two modes of review—one with the Mobile-Sierra presumption and the other without—as the “public interest standard” and the “just and reasonable standard.” See, e. g., In re Southern Company Servs., Inc., 39 FERC ¶ 63,026, pp. 65,134, 65,141 (1987). Decisions from the Courts of Appeals did likewise. See, e. g., Kansas Cities v. FERC, 723 F. 2d 82, 87-88 (CADC 1983); Northeast Utils. Serv. Co. v. FERC, 993 F. 2d 937, 961 (CA1 1993). We do not take this nomenclature to stand for the obviously indefensible proposition that a standard different from the statutory just-and-reasonable standard applies to contract rates. Rather, the term “public interest standard” refers to the differing application of that just-and-reasonable standard to contract rates. See Philadelphia Elec. Co., 58 F. R C. 88, 90 (1977). (It would be less confusing to adopt the Solicitor General’s terminology, referring to the two differing applications of the just-and-reasonable standard as the “ordinary” “just and reasonable standard” and the “public interest standard.” See Reply Brief for Respondent FERC 6.)
B
Recent FERC Innovations; Market-Based Tariffs
In recent decades, the Commission has undertaken an ambitious program of market-based reforms. Part of the impetus for those changes was technological evolution. Historically, electric utilities had been vertically integrated monopolies. For a particular geographic area, a single utility would control the generation of electricity, its transmission, and its distribution to consumers. See Midwest ISO Transmission Owners v. FERC, 373 F. 3d 1361, 1363 (CADC 2004). Since the 1970’s, however, engineering innovations have lowered the cost of generating electricity and transmit *536 ting it over long distances, enabling new entrants to challenge the regional generating monopolies of traditional utilities. See generally New York v. FERC, 535 U. S. 1, 7-8 (2002); Public Util. Disk No. 1 of Snohomish Cty. v. FERC, 272 F. 3d 607, 610 (CADC 2001) (per curiam).
To take advantage of these changes, the Commission has attempted to break down regulatory and economic barriers that hinder a free market in wholesale electricity. It has sought to promote competition in those areas of the industry amenable to competition, such as the segment that generates electric power, while ensuring that the segment of the industry characterized by natural monopoly — namely, the transmission grid that conveys the generated electricity — cannot exert monopolistic influence over other areas. See New York, supra, at 9-10; Snohomish, supra. To that end, FERC required in Order No. 888 that each transmission provider offer transmission service to all customers on an equal basis by filing an “open access transmission tariff.” Promoting Wholesale Competition Through Open Access NonDiscriminatory Transmission Services by Public Utilities, 61 Fed. Reg. 21540 (1996); see New York, supra, at 10-12. That requirement prevents the utilities that own the grid from offering more favorable transmission terms to their own affiliates and thereby extending their monopoly power to other areas of the industry.
To further pry open the wholesale-electricity market and to reduce technical inefficiencies caused when different utilities operate different portions of the grid independently, the Commission has encouraged transmission providers to establish “Regional Transmission Organizations” — entities to which transmission providers would transfer operational control of their facilities for the purpose of efficient coordination. Order No. 2000, 65 Fed. Reg. 810, 811-812 (2000); see Midwest ISO, supra, at 1364. It has encouraged the management of those entities by “Independent System Operators,” not-for-profit entities that operate transmission facili *537 ties in a nondiseriminatory manner. See Midwest ISO, supra. In addition to coordinating transmission service, Regional Transmission Organizations perform other functions, such as running auction markets for electricity sales and offering contracts for hedging against potential grid congestion. See Blumsack, Measuring the Benefits and Costs of Regional Electric Grid Integration, 28 Energy L. J. 147 (2007).
Against this backdrop of technological change and market-based reforms, the Commission over the past two decades has begun to permit sellers of wholesale electricity to file “market-based” tariffs. These tariffs, instead of setting forth rate schedules or rate-fixing contracts, simply state that the seller will enter into freely negotiated contracts with purchasers. See generally Market-Based Rates for Wholesale Sales of Electric Energy, Capacity and Ancillary Services by Public Utilities, Order No. 697, 72 Fed. Reg. 39904 (2007) (hereinafter Market-Based Rates); McGrew 160-167. FERC does not subject the contracts entered into under these tariffs (as it subjected traditional wholesale-power contracts) to § 824d’s requirement of immediate filing, apparently on the theory that the requirement has been satisfied by the initial filing of the market-based tariffs themselves. See Brief for Respondent FERC 28-29 (hereinafter Brief for FERC).
FERC will grant approval of a market-based tariff only if a utility demonstrates that it lacks or has adequately mitigated market power, lacks the capacity to erect other barriers to entry, and has avoided giving preferences to its affiliates. See Market-Based Rates ¶ 7, 72 Fed. Reg. 39907. In addition to the initial authorization of a market-based tariff, FERC imposes ongoing reporting requirements. A seller must file quarterly reports summarizing the contracts that it has entered into, even extremely short-term contracts. See California ex rel. Lockyer v. FERC, 383 F. 3d 1006, 1013 (CA9 2004). It must also demonstrate every four months *538 that it still lacks or has adequately mitigated market power. See ibid. If FERC determines from these filings that a seller has reattained market power, it may revoke the authority prospectively. See Market-Based Rates ¶ 5, 72 Fed. Reg. 39906. And if the Commission finds that a seller has violated its Regional Transmission Organization’s market rules, its tariff, or Commission orders, the Commission may take appropriate remedial action, such as ordering refunds, requiring disgorgement of profits, and imposing civil penalties. See ibid.
Both the Ninth Circuit and the D. C. Circuit have generally approved FERC’s scheme of market-based tariffs. See Lockyer, supra, at 1011-1013; Louisiana Energy & Power Auth. v. FERC, 141 F. 3d 364, 365 (CADC 1998). We have not hitherto approved, and express no opinion today, on the lawfulness of the market-based-tariff system, which is not one of the issues before us. It suffices for the present cases to recognize that when a seller files a market-based tariff, purchasers no longer have the option of buying electricity at a rate set by tariff and contracts no longer need to be filed with FERC (and subjected to its investigatory power) before going into effect.
C
California’s Electricity Regulation and Its Consequences
In 1996, California enacted Assembly Bill 1890 (AB 1890), which massively restructured the California electricity market. See 1996 Cal. Stat. ch. 854 (codified at Cal. Pub. Util. Code Ann. §§ 330-398.5 (West 2004 and Supp. 2008)); see generally Cudahy, Whither Deregulation: A Look at the Portents, 58 N. Y. U. Annual Survey of Am. Law 155, 172-185 (2001) (hereinafter Cudahy). The bill transferred operational control of the transmission facilities of California’s three largest investor-owned utilities to an Independent Service Operator (Cal-ISO). See Pacific Gas & Elec. Co. v. *539 FERC, 464 F. 3d 861, 864 (CA9 2006). It also established the California Power Exchange (CalPX), a nonprofit entity that operated a short-term market — or “spot market” — for electricity. The bill required California’s three largest investor-owned utilities to divest most of their electricity-generation facilities. It then required those utilities to purchase and sell the bulk of their electricity from and to the CalPX’s spot market, permitting only limited leeway for them to enter into long-term contracts. See Public Util. Dist. No. 1 of Snohomish Cty. v. FERC, 471 F. 3d 1053, 1068 (CA9 2006) (case below).
In 1997, FERC approved the Cal-ISO as consistent with the requirements for an Independent Service Operator established in Order No. 888. FERC also approved the CalPX and the investor-owned utilities’ authority to make sales at market-based rates in the CalPX, finding that, in light of the divesture of their generation units and other conditions imposed under the restructuring plan, those utilities had adequately mitigated their market power. See Pacific Gas & Elec. Co., 81 FERC ¶ 61,122, pp. 61,435, 61,435-61,436, 61,537-61,548 (1997).
The CalPX opened for business in March 1998. In the summer of 1999, it expanded to include an auction for sales of electricity under “forward contracts”—contracts in which sellers promise to deliver electricity more than one day in the future (sometimes many years). But the participation of California’s large investor-owned utilities in that forward market was limited because, as we have said, AB 1890 strictly capped the amount of power that they could purchase outside of the spot market. See 471 F. 3d, at 1068.
That diminishment of the role of long-term contracts in the California electricity market turned out to be one of the seeds of an energy crisis. In the summer of 2000, the price of electricity in the CalPX’s spot market jumped dramatically — more than fifteenfold. See ibid. The increase was the result of a combination of natural, economic, and regula *540 tory factors: “flawed market rules; inadequate addition of generating facilities in the preceding years; a drop in available hydropower due to drought conditions; a rupture of a major pipeline supplying natural gas into California; strong growth in the economy and in electricity demand; unusually high temperatures; an increase in unplanned outages of extremely old generating facilities; and market manipulation.” CAlifornians for Renewable Energy, Inc. v. Sellers of Energy and Ancillary Servs., 119 FERC ¶ 61,058, pp. 61,243, 61,247 (2007). Because California’s investor-owned utilities had for the most part been forbidden to obtain their power through long-term contracts, the turmoil in the spot market hit them hard. See Cudahy 174. The high prices led to rolling blackouts and saddled utilities with mounting debt.
In late 2000, the Commission took action. A central plank of its emergency effort was to eliminate the utilities’ reliance on the CalPX’s spot market and to shift their purchases to the forward market. To that end, FERC abolished the requirement that investor-owned utilities purchase and sell all power through the CalPX and encouraged them to enter into long-term contracts. See San Diego Gas & Electric Co. v. Sellers of Energy and Ancillary Servs., 93 FERC ¶ 61,294, pp. 61,980, 61,982 (2000); see also 471 F. 3d, at 1069. The Commission also put price caps on wholesale electricity. See San Diego Gas & Elec. Co. v. Sellers of Energy and Ancillary Servs., 95 FERC ¶ 61,418, p. 62,545 (2001). By June 2001, electricity prices began to decline to normal levels. Id., at 62,546.
D
Genesis of These Cases
The principal respondents in these cases are western utilities that purchased power under long-term contracts during that tumultuous period in 2000 and 2001. Although they are not located in California, the high prices in California spilled *541 over into other Western States. See 471 F. 3d, at 1069. Petitioners are the sellers that entered into the contracts with respondents.
The contracts between the parties included rates that were very high by historical standards. For example, respondent Snohomish signed a 9-year contract to purchase electricity from petitioner Morgan Stanley at a rate of $105/ megawatt hour (MWh), whereas prices in the Pacific Northwest have historically averaged $24/MWh. The contract prices were substantially lower, however, than the prices that Snohomish would have paid in the spot market during the energy crisis, when prices peaked at $3,300/MWh. See id., at 1069-1070.
After the crisis had passed, buyer’s remorse set in and respondents asked FERC to modify the contracts. They contended that the rates in the contracts should not be presumed to be just and reasonable under Mobile-Sierra because, given the sellers’ market-based tariffs, the contracts had never been initially approved by the Commission without the presumption. See Nevada Power Co. v. Enron Power Marketing, Inc., 103 FERC ¶ 61,353, pp. 62,382, 62,387 (2003). Respondents also argued that contract modification was warranted even under the Mobile-Sierra presumption because the contract rates were so high that they violated the public interest. See 103 FERC, at 62,383, 62,387-62,395.
In a preliminary order, the Commission instructed the Administrative Law Judge (ALJ) to consider 12 different factors in deciding whether the presumption could be overcome for the contracts, such as the terms of the contracts, the available alternatives at the time of sale, the relationship of the rates to Commission benchmarks, the effect of the contracts on the financial health of the purchasers, and the impact of contract modification on national energy markets. After a hearing, the ALJ concluded that the Mobile-Sierra presumption should apply to the contracts and that the con *542 tracts did not seriously harm the public interest. In fact, according to the ALJ, even if the Mobile-Sierra presumption did not apply, respondents would not be entitled to have the contracts modified. 103 FERC, at 62,390-62,394.
Between the ALJ’s decision and the Commission’s ruling, the Commission’s staff issued a report (Staff Report) concluding that unlawful activities of various sellers in the spot market had affected prices in the forward market. See id., at 62,396. Respondents raised the report at oral argument before the Commission, and some of them argued that petitioners “were unlawfully manipulating market prices, thereby engaging in fraud and deception in violation of their market-based rate tariffs.” Ibid. Petitioners contended, however, that the Staff Report demonstrated only a correlation between rates in the spot and forward markets, not a causal connection. See ibid.
FERC affirmed the ALJ. The Commission first held that the Mobile-Sierra presumption did apply to the contracts at issue. Although agreeing with respondents that the presumption applies only where FERC has had an initial opportunity to review a contract rate, the Commission relied on the somewhat metaphysical ground that the grant of market-based authority to petitioners qualified as that initial opportunity. See 103 FERC, at 62,388-62,389. The Commission then held that respondents could not overcome the Mobile-Sierra presumption. It recognized that the Staff Report had “found that spot market distortions flowed through to forward power prices,” 103 FERC, at 62,396-62,397, but concluded that this finding, even if true, was not “determinative” because:
“a finding that the unjust and unreasonable spot market caused forward bilateral prices to be unjust and unreasonable would be relevant to contract modification only where there is a ‘just and reasonable’ standard of review. . . . Under the ‘public interest’ standard, to jus *543 tify contract modification it is not enough to show that forward prices became unjust and unreasonable due to the impact of spot market dysfunctions; it must be shown that the rates, terms and conditions are contrary to the public interest.” Id., at 62,397.
The Commission determined that under the factors identified in Sierra, as well as under a totality-of-the-circumstances test, respondents had not demonstrated that the contracts threatened the public interest. See 103 FERC, at 62,397-62,399. On rehearing, respondents reiterated their complaints, including their charge that “their contracts were the product of market manipulation by Enron, Morgan Stanley and other [sellers].” 105 FERC ¶ 61,185, pp. 61,979, 61,989 (2003). The Commission answered that there was “no evidence to support a finding of market manipulation that specifically affected the contracts at issue.” Id., at 61,989.
Respondents filed petitions for review in the Ninth Circuit, which granted the petitions and remanded to the Commission, finding two flaws in the Commission’s analysis.[2] First, the court agreed with respondents that rates set by contract (whether pursuant to a market-based tariff or not) are presumptively reasonable only where FERC has had an initial opportunity to review the contracts without applying the Mobile-Sierra presumption. To satisfy that prerequisite under the market-based tariff regime, the court said, the Commission must promptly review the terms of contracts after their formation and must modify those that do not appear to be just and reasonable when evaluated without the Mobile-Sierra presumption (rather than merely revok *544 ing market-based authority prospectively but leaving preexisting contracts intact). See 471 F. 3d, at 1075-1077, 1079-1085. This initial review must include an inquiry into “the market conditions in which the contracts at issue were formed,” and market “dysfunction” is a ground for finding a contract not to be just and reasonable. Id., at 1085-1087. Second, the Ninth Circuit held that even assuming that the Mobile-Sierra presumption applied, the standard for overcoming that presumption is different for a purchaser’s challenge to a contract, namely, whether the contract rate exceeds a “zone of reasonableness.” 471 F. 3d, at 1088-1090.
We granted certiorari. See 551 U. S. 1189 (2007).
II
A
Application of Mobile-Sierra Presumption to Contracts Concluded Under Market-Based Rate Authority
As noted earlier, the FERC order under review here agreed with the Ninth Circuit’s premise that the Commission must have an initial opportunity to review a contract without the Mobile-Sierra presumption, but maintained that the authorization for market-based rate authority qualified as that initial review. Before this Court, however, FERC changes its tune, arguing that there is no such prerequisite — or at least that FERC could reasonably conclude so and therefore that Chevron deference is in order. See Brief for FERC 20-21, 33-34; Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837 (1984). We will not uphold a discretionary agency decision where the agency has offered a justification in court different from what it provided in its opinion. See SEC v. Chenery Corp., 318 U. S. 80, 94-95 (1943). But FERC has lucked out: The Chenery doctrine has no application to these cases, because we conclude that the Commission was required, under our decision in Sierra, *545 to apply the Mobile-Sierra presumption in its evaluation of the contracts here. That it provided a different rationale for the necessary result is no cause for upsetting its ruling. “To remand would be an idle and useless formality. Chenery does not require that we convert judicial review of agency action into a ping-pong game.” NLRB v. Wyman-Gordon Co., 394 U. S. 759, 766-767, n. 6 (1969) (plurality opinion).
We are in broad agreement with the Ninth Circuit on a central premise: There is only one statutory standard for assessing wholesale-electricity rates, whether set by contract or tariff — the just-and-reasonable standard. The plain text of the FPA states that “[a]ll rates . . . shall be just and reasonable.” 16 U. S. C. § 824d(a); see also § 824e(a) (2000 ed., Supp. V). But we disagree with the Ninth Circuit’s interpretation of Sierra as requiring (contrary to the statute) that the Commission apply the standard differently, depending on when a contract rate is challenged. In the Ninth Circuit’s view, Sierra was premised on the idea that “as long as the rate was just and reasonable when the contract was formed, there would be a presumption . . . that the reasonableness continued throughout the term of the contract.” 471 F. 3d, at 1077. In other words, so long as the Commission concludes (either after a hearing or by allowing a rate to go into effect) that a contract rate is just and reasonable when initially filed, the rate will be presumed just and reasonable in future proceedings.
That is a misreading of Sierra. Sierra was grounded in the commonsense notion that “[i]n wholesale markets, the party charging the rate and the party charged [are] often sophisticated businesses enjoying presumptively equal bargaining power, who could be expected to negotiate a ‘just and reasonable’ rate as between the two of them.” Verizon, 535 U. S., at 479. Therefore, only when the mutually agreed-upon contract rate seriously harms the consuming *546 public may the Commission declare it not to be just and reasonable.[3] Sierra thus provided a definition of what it means for a rate to satisfy the just-and-reasonable standard in the contract context — a definition that applies regardless of when the contract is reviewed. The Ninth Circuit, by contrast, essentially read Sierra “as the equivalent of an estoppel doctrine,” whereby an initial Commission opportunity for review prevents the Commission from modifying the rates absent serious future harm to the public interest. Tewksbury & Lim, Applying the Mobile-Sierra Doctrine to Market-Based Rate Contracts, 26 Energy L. J. 437, 457-458 (2005). But Sierra said nothing of the sort. And given that the Commission’s passive permission for a rate to go into effect does not constitute a finding that the rate is just and reasonable, it would be odd to treat that initial “opportunity for review” as curtailing later challenges.
The Ninth Circuit found support for its prerequisite in our decision in FPC v. Texaco Inc., 417 U. S. 380 (1974). In that case, we warned that the Commission’s attempt to rely solely on market forces to evaluate rates charged by small natural-gas producers was inconsistent with the Natural Gas Act’s insistence that rates be just and reasonable. See id., at 397. The Ninth Circuit apparently took this to mean that all initially filed contracts must be subject to review without the Mobile-Sierra presumption. But Texaco had nothing to do with that doctrine. It held that the Commission had improperly implemented a scheme of total deregulation by applying no standard of review at all to small-producer rates. See 417 U. S., at 395-397. It did not cast doubt on the proposition that in a proper regulatory scheme, the ordinary mode for evaluating contractually set rates is to look to *547 whether the rates seriously harm the public interest, not to whether they are unfair to one of the parties that voluntarily assented to the contract. Cf. id., at 391, n. 4.
Nor do we agree with the Ninth Circuit that FERC must inquire into whether a contract was formed in an environment of market “dysfunction” before applying the Mobile-Sierra presumption. Markets are not perfect, and one of the reasons that parties enter into wholesale-power contracts is precisely to hedge against the volatility that market imperfections produce. That is why one of the Commission’s responses to the energy crisis was to remove regulatory barriers to long-term contracts. It would be a perverse rule that rendered contracts less likely to be enforced when there is volatility in the market. (Such a rule would come into play, after all, only when a contract formed in a period of “dysfunction” did not significantly harm the consuming public, since contracts that seriously harm the public should be set aside even under the Mobile-Sierra presumption.) By enabling sophisticated parties who weathered market turmoil by entering long-term contracts to renounce those contracts once the storm has passed, the Ninth Circuit’s holding would reduce the incentive to conclude such contracts in the future. Such a rule has no support in our case law and plainly undermines the role of contracts in the FPA’s statutory scheme.
To be sure, FERC has ample authority to set aside a contract where there is unfair dealing at the contract formation stage — for instance, if it finds traditional grounds for the abrogation of the contract such as fraud or duress. See 103 FERC, at 62,399-62,400 (“[T]here is no evidence of unfairness, bad faith, or duress in the original negotiations”). In addition, if the “dysfunctional” market conditions under which the contract was formed were caused by illegal action of one of the parties, FERC should not apply the Mobile-Sierra presumption. See Part III, infra. But the mere *548 fact that the market is imperfect, or even chaotic, is no reason to undermine the stabilizing force of contracts that the FPA embraced as an alternative to “purely tariff-based regulation.” Verizon, 535 U. S., at 479. We may add that evaluating market “dysfunction” is a very difficult and highly speculative task — not one that the FPA would likely require the agency to engage in before holding sophisticated parties to their bargains.
We reiterate that we do not address the lawfulness of FERC’s market-based-rates scheme, which assuredly has its critics. But any needed revision in that scheme is properly addressed in a challenge to the scheme itself, not through a disfigurement of the venerable Mobile-Sierra doctrine. We hold only that FERC may abrogate a valid contract only if it harms the public interest.
B
Application of “Excessive Burden” Exception to High-Rate Challenges
We turn now to the Ninth Circuit’s second holding: that a “zone of reasonableness” test should be used to evaluate a buyer’s challenge that a rate is too high. In our view that fails to accord an adequate level of protection to contracts. The standard for a buyer’s challenge must be the same, generally speaking, as the standard for a seller’s challenge: The contract rate must seriously harm the public interest. That is the standard that the Commission applied in the proceedings below.
We are again in agreement with the Ninth Circuit on a starting premise: It is clear that the three factors we identified in Sierra — “where [a rate] might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory,” 350 U. S., at 355—are not all precisely applicable to the high-rate challenge of a purchaser (where, for example, the relevant question is not whether “other customers” [of *549 the utility] would be excessively burdened, but whether any customers of the purchaser would be); and that those three factors are in any event not the exclusive components of the public interest. In its decision below, the Commission recognized both these realities. See 103 FERC, at 62,397 (“Nevada Companies failed to show that the contract terms at issue impose an excessive burden on their customers” (emphasis added)); id., at 62,398 (“The record also demonstrates that Snohomish presented no evidence that its contract with Morgan Stanley adversely affected Snohomish or its ratepayers” (emphasis added)); id., at 62,398-62,399 (evaluating the “totality of circumstances”); see also Brief for FERC 41-42.[4]
Where we disagree with the Ninth Circuit is on the overarching “zone of reasonableness” standard it established for evaluating a high-rate challenge and setting aside a contract rate: whether consumers’ electricity bills “are higher than they would otherwise have been had the challenged contracts called for rates within the just and reasonable range,” i. e., rates that equal “marginal cost.”[5] 471 F. 3d, at 1089. *550 The Ninth Circuit derived this test from our statement in Sierra that a contract rate would have to be modified if it were so low that it imposed an “excessive burden” on other wholesale purchasers. The Ninth Circuit took “excessive burden” to mean merely the burden caused when one set of consumers is forced to pay above marginal cost to compensate for below-marginal-cost rates charged other consumers. See 471 F. 3d, at 1088. And it proceeded to apply a similar notion of “excessive burden” to high-rate challenges (where all the burden of the above-marginal-cost contract rate falls on the purchaser’s own customers, and does not affect the customers of third parties). Id., at 1089. That is a misreading of Sierra and our later cases. A presumption of validity that disappears when the rate is above marginal cost is no presumption of validity at all, but a reinstitution of cost-based rather than contract-based regulation. We have said that, under the Mobile-Sierra presumption, setting aside a contract rate requires a finding of “unequivocal public necessity,” Permian Basin, 390 U. S., at 822, or “extraordinary circumstances,” Arkansas Louisiana Gas Co. v. Hall, 453 *551 U. S. 571, 582 (1981). In no way can these descriptions be thought to refer to the mere exceeding of marginal cost.
The Ninth Circuit’s standard would give short shrift to the important role of contracts in the FPA, as reflected in our decision in Sierra, and would threaten to inject more volatility into the electricity market by undermining a key source of stability. The FPA recognizes that contract stability ultimately benefits consumers, even if short-term rates for a subset of the public might be high by historical standards — which is why it permits rates to be set by contract and not just by tariff. As the Commission has recently put it, its “first and foremost duty is to protect consumers from unjust and unreasonable rates; however, . . . uncertainties regarding rate stability and contract sanctity can have a chilling effect on investments and a seller’s willingness to enter into long-term contracts and this, in turn, can harm customers in the long run.” Market-Based Rates ¶ 6, 72 Fed. Reg. 33906-33907.
Besides being wrong in principle, in its practical effect the Ninth Circuit’s rule would impose an onerous new burden on the Commission, requiring it to calculate the marginal cost of the power sold under a market-based contract. Assuming that FERC even ventured to undertake such an analysis, rather than reverting to the anden regime of cost-of-service ratesetting, the regulatory costs would be enormous. We think that the FPA intended to reserve the Commission’s contract-abrogation power for those extraordinary circumstances where the public will be severely harmed.[6]
*552 III
Defects in FERC’s Analysis Supporting Remand
Despite our significant disagreement with the Ninth Circuit, we find two errors in the Commission’s analysis, and we therefore affirm the judgment below on alternative grounds.
First, it appears, as the Ninth Circuit concluded, see 471 F. 3d, at 1090, that the Commission may have looked simply to whether consumers’ rates increased immediately upon the relevant contracts’ going into effect, rather than determining whether the contracts imposed an excessive burden on consumers “down the line,” relative to the rates they could have obtained (but for the contracts) after elimination of the dysfunctional market. For example, the Commission concluded that two of the respondents would experience “rate decreases of approximately 20 percent for retail service” during the period covered by the contracts. 103 FERC, at 62,397. But the baseline for that computation was the rate they were paying before the contracts went into effect. That disparity is certainly a relevant consideration; but so is *553 the disparity between the contract rate and the rates consumers would have paid (but for the contracts) further down the line, when the open market was no longer dysfunctional. That disparity, past a certain point, could amount to an “excessive burden.” That is what was contemplated by Sierra, which involved a challenge 5 years into a 15-year contract. The “excessive burden” on other customers to which the opinion referred was assuredly the current burden, and not only the burden imposed at the very outset of the contract. See 350 U. S., at 355. The “unequivocal public necessity” that justifies overriding the Mobile-Sierra presumption does not disappear as a factor once the contract enters into force. Thus, FERC’s analysis on this point was flawed — or at least incomplete. As the Ninth Circuit put it, “[i]t is entirely possible that rates had increased so high during the energy crises because of dysfunction in the spot market that, even with the acknowledged decrease in rates, consumers still paid more under the forward contracts than they otherwise would have.” 471 F. 3d, at 1090. If that is so, and if that increase is so great that, even taking into account the desirability of fostering market-stabilizing long-term contracts, the rates impose an excessive burden on consumers or otherwise seriously harm the public interest, the rates must be disallowed.
Second, respondents alleged before FERC that some of the petitioners in these cases had engaged in market manipulation in the spot market. See, e. g., 105 FERC, at 61,989 (“Snohomish and Nevada Companies argue that their contracts were the product of market manipulation by Enron, Morgan Stanley and other Respondents, which, as established by the Commission Staff, engaged in market manipulation”). The Staff Report concluded, as we have said, that the abnormally high prices in the spot market during the energy crisis influenced the terms of contracts in the forward market. But the Commission dismissed the relevance of the Staff Report on the ground that it had not demonstrated that forward market prices were so high as to overcome the *554 Mobile-Sierra presumption. We conclude, however, that if it is clear that one party to a contract engaged in such extensive unlawful market manipulation as to alter the playing field for contract negotiations, the Commission should not presume that the contract is just and reasonable. Like fraud and duress, unlawful market activity that directly affects contract negotiations eliminates the premise on which the Mobile-Sierra presumption rests: that the contract rates are the product of fair, arms-length negotiations. The mere fact that the unlawful activity occurred in a different (but related) market does not automatically establish that it had no effect upon the contract — especially given the Staff Report’s (unsurprising) finding that high prices in the one market produced high prices in the other. We are unable to determine from the Commission’s orders whether it found the evidence inadequate to support the claim that respondents’ alleged unlawful activities affected the contracts at issue here. It said in its order on rehearing, 105 FERC, at 61,989, that “[w]e .. . found no evidence to support a finding of market manipulation [by respondents] that specifically affected the contracts at issue.” But perhaps that must be read in light of the Commission’s above described rejection of the Staff Report on the ground that high spot-market prices caused by manipulation are irrelevant unless the forward market prices fail the Mobile-Sierra standard; and in light of the statement in its initial order, in apparent response to the claim of spot-market manipulation by respondents, 103 FERC, at 62,397, that “a finding that the unjust and unreasonable spot market prices caused forward bilateral prices to be unjust and unreasonable would be relevant to contract modification only where there is a ‘just and reasonable’ standard of review.”
We emphasize that the mere fact of a party’s engaging in unlawful activity in the spot market does not deprive its forward contracts of the benefit of the Mobile-Sierra presumption. There is no reason why FERC should be able to abro *555 gate a contract on these grounds without finding a causal connection between unlawful activity and the contract rate. Where, however, causality has been established, the Mobile-Sierra presumption should not apply.
On remand, the Commission should amplify or clarify its findings on these two points. The judgment of the Court of Appeals is affirmed, and the cases are remanded for proceedings consistent with this opinion.

It is so ordered.

The Chief Justice and Justice Breyer took no part in the consideration or decision of these cases.

 We also use “Commission” to refer to the Federal Power Commission, FERC’s predecessor.

 In a holding not challenged before this Court, the Ninth Circuit concluded that the contracts at issue did not contain “Memphis clause[s],” 471 F. 3d 1053, 1079 (2006) (citing United Gas Pipe Line Co. v. Memphis Light, Gas and Water Div., 358 U. S. 103 (1958)), see supra, at 534, that would have precluded application of the Mobile-Sierra presumption.

 We do not say, as the dissent alleges, post, at 561 (opinion of Stevens, J.), that the public interest is not also relevant in a challenge to unilaterally set rates. But it is the “ ‘sole concern’ ” in a contract case. See FPC v. Sierra Pacific Power Co., 350 U. S. 348, 355 (1956).

 The dissent criticizes the Commission’s decision because it took into account under the heading “totality of the circumstances” only the circumstances of the contract formation, not “circumstances exogenous to contract negotiations, including natural disasters and market manipulation by entities not parties to the challenged contract.” Post, at 567. Those considerations are relevant to whether the contracts impose an “excessive burden” on consumers relative to what they would have paid absent the contracts. It is precisely our uncertainty whether the Commission considered those “circumstances exogenous to contract negotiations,” discussed in Part III of our opinion, that causes us to approve the remand to FERC.

 Elsewhere the Ninth Circuit softened this standard somewhat, saying that “[e]ven if a particular rate exceeds marginal cost... it may still be within this reasonable range — or ‘zone of reasonableness’ — if that higher-than-cost-based price results from normal market forces and is part of a general trend toward rates that do reflect cost.” 471 F. 3d, at 1089. We are not sure (and we think no one can be sure) precisely what this means. It has no basis in our opinions, and is in any event wrong because its point *550 of departure (the general principle that rates cannot exceed marginal cost) contradicts Mobile-Sierra.
The Ninth Circuit purported to find support for its “zone of reasonableness” test in the case law of the District of Columbia Circuit. But the cited case stands only for the proposition that a market-based scheme must ensure that market forces will, “over the long pull,” cause rates to approximate marginal cost. Interstate Natural Gas Assn, of Am. v. FERC, 285 F. 3d 18, 31 (2002). Nowhere does the opinion suggest that the standard for reforming a particular contract validly entered into under a market-based scheme is whether the rates approximate marginal cost.
By the same token, our approval of FERC’s decision not to set prospective area rates solely with reference to pre-existing contract prices, Permian Basin Area Rate Cases, 390 U. S. 747, 792-793 (1968), does not support, as the dissent thinks, post, at 562-563, n. 2, the view that the standard for abrogating an existing, valid contract is anything less than the Mobile-Sierra standard. That is the standard Permian Basin applied when actually confronted with the issue of contract modification. See 390 U. S., at 781-784, 821-822.

 The dissent claims that we have misread the FPA because its provisions “do not distinguish between rates set unilaterally by tariff and rates set bilaterally by contract.” Post, at 556. But the dissent’s interpretation, whatever plausibility it has as an original matter, cannot be squared with Sierra, which plainly distinguished between unilaterally and bilaterally set rates, and said that the only relevant consideration for the Commission in the latter case is whether the public interest is harmed. And the circumstances identified in Sierra as implicating the public interest *552 refer to something more than a small dent in the consumer’s pocket, which is why our subsequent cases have described the standard as a high one.
At the end of the day, the dissent simply argues against the settled understanding of the FPA that has prevailed in this Court, lower courts, and the Commission for half a century. Although the dissent is correct that we have never used the phrase “Mobile-Sierra doctrine” in our cases, that is probably because the understanding of it was so uniform that no circuit split concerning its meaning arose until the Ninth Circuit’s erroneous decision in these cases. If one searches the Commission’s reports, over 600 decisions since 2000 alone have cited the doctrine, see Brief for Electric Power Supply Association et al. as Amici Curiae 15, and the Courts of Appeals have used the term “Mobile-Sierra doctrine” (or “Sierra-Mobile” doctrine) over 75 times since 1974. If there were ever a context where long-settled understanding should be honored it is here, where a statutory decision (subject to revision by Congress) has been understood the same way for many years by lower courts, by this Court, by the federal agency the statute governs, and hence surely by the private actors trying to observe the law.