MEMORANDUM *
Montana Consumer Counsel and Montana Public Service Commission (collectively, “Petitioners”) and Intervenor REC Silicon petition for review from the orders of the Federal Energy Regulatory Commission (“FERC”), granting PPL Montana LLC, PPL Colstrip I LLC, and PPL Col-strip II LLC (collectively, “PPL”) market-based rate authority. We have jurisdiction to review final orders of FERC pursuant to the Federal Powers Act § 313(b), codified at 16 U.S.C. § 8251(b), and the Administrative Procedure Act, 5 U.S.C. § 702.[1] FERC’s determination of whether a supplier’s rates are “just and reasonable” as required by 16 U.S.C. § 824d(a) is “afford[ed] great deference[,]” Morgan Stanley Capital Group, Inc. v. Public Utility District No. 1 of Snohomish County, — U.S. —, 128 S.Ct. 2733, 2738, 171 L.Ed.2d 607 (2008). After careful review, we hold that FERC’s policy choices and methods of calculation are not arbitrary and capricious and its factual conclusions are supported by substantial evidence. We therefore affirm FERC’s orders.
1. Petitioners challenge FERC’s application of the “snapshot in time” approach, maintaining that its application in this case effectively removed several hundred megawatts of PPL’s generating capacity from FERC’s market power calculations because, during the twelve-month test period on which PPL’s 2004 DPT was based, that *993 capacity was tied up in contracts.[2]
We need not decide whether there was error in this regard, as any error would have been harmless. FERC supported its market power determination with the alternative holding that, even “consider[ing] adjustments to the DPT with regard to [the] expiring contracts as protestors request, the evidence would still indicate that PPL Companies do not have generation market power.” FERC specifically stated that in coming to this conclusion, it was assuming the acceptance of “all of NorthWestern’s corrections to PPL Companies’ 2004 analysis,” and showed in some detail how it reached that alternative result.
Petitioners argue on appeal that their alternative study was different from NorthWestern’s and was not considered. We see no significant differences, however, between NorthWestern’s suggested analysis and Petitioners’. Both called for adding back in 450 MW of PPL’s capacity that was tied up in expiring contracts, in addition to various other corrections. FERC held that, even adding this 450 MW back into PPL’s available economic capacity measure, its finding that PPL lacked market power would not change.
In sum, we express no opinion on FERC’s “snapshot” approach generally. We hold only that FERC’s conclusion that PPL lacked market power is supported by its alternative holding regarding the available economic capacity measure; this alternative holding is supported by substantial evidence.
2. Petitioners have failed to show that FERC acted arbitrarily and capriciously in relying on data from the spot market, rather than the long-term firm power market. FERC provided reasons to support its presumption that absent barriers to entry, spot-market data is an appropriate proxy for the state of the long-term market. We are reluctant to second-guess its judgment on questions of policy within its expertise. See Pub. Utils. Comm’n v. FERC, 254 F.3d 250, 254 (D.C.Cir.2001). On the current record, we cannot conclude that FERC’s use of the short-term/long-term presumption is in conflict with its statutory mandate to ensure “just and reasonable” rates.
Relatedly, FERC did not err in concluding that Petitioners failed to demonstrate the existence of barriers to entry that would invalidate FERC’s reliance on spot-market data. Petitioners alleged that PPL’s market dominance and its pricing flexibility allowed it to dissuade new market entrants, and that new entrants’ “attempts to construct new plants ‘can be delayed or blocked’ by PPL.” FERC held these allegations unpersuasive and did not abuse its discretion in doing so. “[I]t is undeniably PPL Companies’ right to express an opinion in a public proceeding before a state agency,” and the record contains no specific evidence that PPL did anything more than that. Further, the record does contain evidence—namely, NorthWestern’s Request For Proposals (“RFP”) results—that there were new market entrants in 2004 who were willing to compete with PPL. FERC’s finding that PPL did not erect barriers to entry was therefore supported by substantial evidence, and given the vague and conclusory nature of Petitioners’ allegations, no further hearing was necessary. See Louisiana Energy and Power Authority v. *994 FERC, 141 F.3d 364, 369-71 (D.C.Cir. 1998).[3]
Petitioners also urge that other barriers to long-term market entry, not directly of PPL’s making, exist — factors such as the length of time it takes to construct new generation facilities in Montana and other unspecified “regulatory and other constraints.” Yet, Petitioners have not demonstrated specifically how such constraints operate to block entry to the long-term market, such that they would invalidate FERC’s use of the short-term market as a meaningful proxy. Nor do Petitioners point to any case law suggesting that regulatory difficulties in constructing new generation facilities constitute a barrier to entry in the sense relevant here. In short, on the record before us, we see no basis for overturning FERC’s determination that analysis of the short-term power market serves as an adequate proxy in this case.
3. FERC did ■ not, as Petitioners suggest, simply accept as true PPL’s assertions regarding how much competing supply was “available” for long-term firm sales to the Northwestern control area. Rather, FERC considered “market prices, input costs, and transmission availability” for competing supplies in some detail. After FERC at the Screens Order stage rejected several of PPL’s assertions as to how much of the Colstrip Plant capacity was available, PPL adjusted its initial DPT accordingly. Also, in response to criticisms, PPL’s revised DPT omitted a portion of Puget Sound Energy’s capacity that PPL had previously claimed as available competing capacity, as well as portions of the Colstrip facility’s capacity.
As noted above, FERC found that “[e]ven if we were to accept all of NorthWestern’s corrections to PPL Companies’ 2004 analysis, the DPT results ... do not, on balance, support NorthWestern’s contention that PPL Companies have the ability to exercise market power.” (Emphasis added.) The differences between Petitioners’ and NorthWestern’s calculations stem largely from the fact that Petitioners’ calculations incorporated adjustments for import limitations, which FERC explained it would not accept because those limits were “improperly calculated.” Further, assuming Petitioners are correct that FERC failed to consider its Attachment A analysis (perhaps by confusing that document with another, similarly-labeled document), the calculations in the Attachment A analysis dealt only with PPL’s 2006 and 2007 data, which FERC did not consider, and are therefore not relevant to FERC’s conclusions based on 2004 data. As to the broader criticisms of PPL’s calculation methods set out in the Attachment A analysis, these criticisms were included in Petitioners’ and NorthWestern’s other filings, and so were taken into consideration by FERC.
In sum, FERC did not arbitrarily and capriciously discount any relevant information submitted by Petitioners, and its determination of the amount of available competing capacity is supported by substantial evidence.
*995 4. FERC did not err in allowing PPL to use a Simultaneous Transmission Import Limits study (“SIL”), rather than data from the Open Access Same-Time Information System (“OASIS”), to determine whether import transmission capacity existed for the out-of-state generators that PPL had identified as competing capacity. We accord significant deference to FERC’s choice of methods for calculating market conditions, see Morgan Stanley, 128 S.Ct. at 2738; Ass’n of Oil Pipe Lines v. FERC, 83 F.3d 1424, 1431 (D.C.Cir.1996), particularly when, as here, those calculations call for considerable technical expertise. See Tennessee Gas Pipeline Co. v. FERC, 400 F.3d 23, 27 (D.C.Cir.2005). The record does not clearly support Petitioners’ claim that OASIS data better approximates the relevant market realities than SIL data, and FERC would have considered OASIS data as a supplement to the SIL data if Petitioners had complied with FERC’s guidelines when submitting the OASIS data. We therefore decline to overturn FERC’s decision here.
5. FERC’s orders did not improperly fail to take antitrust policy into account. FERC made clear on rehearing that the DPT analysis it employed is based upon and incorporates antitrust principles, and antitrust enforcement is “beyond the scope” of FERC’s authority in a § 206 proceeding. See Californians for Renewable Energy, Inc. v. British Columbia Hydro and Power, 98 FERC ¶ 61,085, ¶ 61,-253 (2002).
6. FERC’s use of Electric Quarterly Report (“EQR”) data as corroboration of its finding that PPL lacked market power was not error. FERC’s regulations permit it to “take official notice of ... any matter about which the Commission, by reason of its functions, is expert.” 18 C.F.R. § 385.508(d)(1). EQR data is such a matter. FERC took notice of the EQR data in a transparent manner; the data was publicly filed and available on FERC’s website. Compare Ohio Bell Tel. Co. v. Public Utilities Commission of Ohio, 301 U.S. 292, 302, 57 S.Ct. 724, 81 L.Ed. 1093 (1937). In any event, the EQR data served only as corroboration; FERC stated that its conclusion would have been the same had it not taken the EQR data into consideration.
In sum, based on the record before us, we see no reversible error in FERC’s orders. On the record in this case, Petitioners have not shown that FERC acted arbitrarily and capriciously, or that its factual findings are unsupported by substantial evidence.
For the foregoing reasons, the petition for review is DENIED.

 This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

. We have jurisdiction over all of Petitioners’ claims, as well as over those claims of interve-nor REC Silicon that were raised before FERC by Petitioners on rehearing. See Ala. Mun. Distribs. Group v. FERC, 300 F.3d 877, 880 (D.C.Cir.2002); 16 U.S.C. § 8251(b).

. FERC argues that its change-in-status reporting requirements and triennial reviews would capture this capacity after the fact, even if it went undetected at the DPT stage. We need not decide whether this is so, as we affirm FERC’s determination on an alternative ground.

. In so holding, FERC did not impermissibly shift the burden of proof. Petitioners are correct that PPL, having failed the market screens test, faced a rebuttable presumption that it had market power and bore the burden of proving otherwise at the DPT stage. But this shifted burden does not undo the substantive presumption that short-term market data is indicative of long-term market competitiveness. FERC requires that data be drawn from the short-term market, but it permits protestors to defeat the presumption by showing that the short-term market is not in fact indicative of the long-term market because entry barriers exist. FERC’s allocation of burdens is consistent with the agency's past practice. See Wisconsin Valley Improvement Co. v. FERC, 236 F.3d 738, 748 (D.C.Cir.2001).