# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 5, 2021          Decided August 6, 2021

No. 20-1156

PUBLIC CITIZEN, INC.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

DYNEGY MARKETING AND TRADE, LLC, ET AL.,
INTERVENORS

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

*Scott L. Nelson* argued the cause for petitioner. With him on the briefs was *Allison M. Zieve*.

*Lona T. Perry*, Deputy Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Matthew R. Christiansen*, General Counsel, *David L. Morenoff*, Deputy General Counsel, and *Robert H. Solomon*, Solicitor.

*Richard P. Bress* argued the cause for intervenors Vistra Corp., *et al.* With him on the brief were *David L. Schwartz* and *Tyce R. Walters*.

*Paul W. Hughes* and *David G. Tewksbury* were on the brief for *amicus curiae* Electric Power Supply Association in support of respondent.

Before: TATEL, MILLETT, and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*:  This case is about the price of wholesale electricity—electricity sold from, for example, a power plant to a consumer-serving utility company.  More precisely, this case concerns sales of capacity, which is typically a commitment by a power plant to provide electricity to a utility in the future.  In April 2015, an auction for electrical capacity in Illinois produced a striking result.  Capacity in neighboring regions (from Louisiana up to Minnesota) uniformly sold for less than $3.50 per megawatt-day.  But in a region covering much of Illinois, the auction resulted in capacity prices of $150 per megawatt-day—more than 40 times the price in those neighboring regions and a nearly ninefold increase from the prior year's price of $16.75.

After complaints were filed, the Federal Energy Regulatory Commission identified numerous problems with the existing auction rules.  The Commission ordered that the auction rules be changed prospectively to prevent unjust and unreasonable price spikes.  The Commission also launched an investigation into potential market manipulation in the 2015 Auction that lasted more than three years.  Nevertheless, the Commission later ruled that the identified flaws in the auction rules and the high price range those rules established, as well as the allegations of market manipulation, did not call into question the 2015 Auction or the $150 price it had produced.

We reject petitioner's argument that the Commission must approve every individual auction price before it goes into effect. That is not what the market-based rate scheme requires. And we lack the power to review the Commission's discretionary decision to close its investigation into market manipulation in the 2015 Auction.

As for the Commission's analysis of the 2015 Auction, we hold that its decision was arbitrary and capricious. The Commission failed to adequately explain why the problems it identified in the existing auction rules affecting pricing—problems it ordered fixed going forward—did not also affect the fairness of the 2015 Auction itself. That omission is particularly glaring in light of the starkly anomalous rates that the Auction produced. Based on the unwonted record before the Commission and the multi-year Commission investigation into market manipulation that record prompted, the agency's conclusory and unreasoned decision to sustain the 2015 Auction rates does not hold up.

As a result, the petition for review is granted in part and denied in part.

# I

## A

### 1

The Federal Power Act, 16 U.S.C. §§ 791a *et seq.*, governs both the transmission and the wholesale marketing of electricity in interstate commerce, *id.* § 824(a). The Act assigns to the Federal Energy Regulatory Commission the responsibility to regulate these activities in the public interest. *Id.* § 824(a), (b).

Section 205 of the Act, 16 U.S.C. § 824d, mandates that "[a]ll rates and charges" within the Commission's jurisdiction, as well as "all rules and regulations" pertaining to those rates and charges, must be "just and reasonable[.]" *Id.* § 824d(a). Section 205 also requires all public utilities to "file with the Commission * * * all rates and charges for any transmission or sale subject to the jurisdiction of the Commission[.]" *Id.* § 824d(c).

Section 206 of the Act, 16 U.S.C. § 824e, tasks the Commission with ensuring that any rates charged are just and reasonable. To do so, the Commission can initiate enforcement proceedings on its own or upon a complaint from a third party. *Id.* § 824e(a). If the Commission finds that any rate demanded by a utility within the Commission's jurisdiction is "unjust, unreasonable, unduly discriminatory or preferential," then the Commission must overturn that rate and impose its own just and reasonable rate. *Id.* The burden of proving an unjust or unreasonable rate rests with the party that initiated the proceeding—that is, the Commission or the third-party complainant. *Id.* § 824e(b).

**2**

Since the end of the last century, electricity production has been increasingly characterized by competitive markets. In light of that trend, Congress added a new provision to the Federal Power Act in 2005, which is referred to as Section 222 (codified at 16 U.S.C. § 824v). Entitled "Prohibition of energy market manipulation[,]" Section 222 makes it unlawful for any entity "to use or employ, in connection with the purchase or sale of electric energy or the purchase or sale of transmission services subject to the jurisdiction of the Commission, any manipulative or deceptive device or contrivance" in contravention of Commission rules. *Id.* § 824v(a).

Section 222, though, does not "create a private right of action." *Id.* § 824v(b). Instead, enforcement of the prohibition on manipulation is assigned exclusively to the Commission. *Id.* Nonetheless, private persons may bring allegations of market manipulation to the attention of the Commission by filing a complaint under Section 306 of the Act, *id.* § 825e.

Implementing the 2005 Act, the Commission has defined market manipulation more precisely, modeling it on the Securities Exchange Act's anti-manipulation provisions, 15 U.S.C. § 78j(b). *See* Prohibition of Energy Mkt. Manipulation, 114 FERC ¶ 61,047, at 5 (Jan. 19, 2006). In that way, the prohibition "is not intended to regulate negligent practices or corporate mismanagement, but rather to deter or punish fraud in wholesale energy markets." *Id.* ¶ 5. The Commission's regulations make it unlawful, in connection with the purchase or sale of electricity or transmission services, to (1) "use or employ any device, scheme, or artifice to defraud," (2) "make any untrue statement of a material fact or * * * omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," or (3) "engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity." 18 C.F.R. § 1c.2.

The Commission "defines fraud generally," so that it "include[s] any action, transaction, or conspiracy for the purpose of impairing, obstructing or defeating a well-functioning market." Prohibition of Energy Mkt. Manipulation, 114 FERC ¶ 61,047, at 38–39. The Commission has "repeatedly held" that "[a]n entity need not violate a tariff, rule or regulation to commit fraud." *Houlian Chen Powhatan Energy Fund*, 151 FERC ¶ 61,179, at 58 (May 29, 2015). As the Commission has explained, "tariffs cannot be written to prohibit all possible fraudulent behavior as '[t]he methods and

techniques of manipulation are limited only by the ingenuity of man.'" *Id*. (alteration in original); *see also Vitol Inc. & Federico Corteggiano*, 169 FERC ¶ 61070, at 32 (Oct. 25, 2019); *In Re Make-Whole Payments & Related Bidding Strategies*, 144 FERC ¶ 61068, at 15 n.8 (July 30, 2013) ("Many of the Commission's major enforcement actions under Rule 1c (whether litigated or settled) have concerned, either in whole or in part, market manipulation in the absence of a violation of a specific tariff provision or comparable specific market rule.").

## B

Before the advent of competitive electricity markets, a utility would commonly comply with the Federal Power Act by determining the dollar prices it wanted to charge for units of electricity, and then filing a schedule of those rates—known as a "tariff"—with the Commission. *See Morgan Stanley Cap. Group Inc. v. Public Util. Dist. No. 1 of Snohomish County*, 554 U.S. 527, 531 (2008). Those rates generally reflected the utility's costs plus a reasonable rate of return. *Id.* at 532.

Since 1988, however, the Commission has permitted wholesale electricity sellers, such as utilities that own power plants, to file "market-based" tariffs instead. *Morgan Stanley*, 554 U.S. at 537; Market-Based Rates for Wholesale Sales of Electric Energy, Capacity and Ancillary Services by Public Utilities, 72 Fed. Reg. 39,904, 39,907 (July 20, 2007) ("Market-Based Rates"). Market-based tariffs do not list any actual prices for electricity, but instead "simply state that the seller will enter into freely negotiated contracts with purchasers." *Morgan Stanley*, 554 U.S. at 537.

This court has held that the Commission's market-based approach is consistent with the Federal Power Act's requirement of "just and reasonable" rates, reasoning that, in a

"competitive market, where neither buyer nor seller has significant market power, it is rational to assume that the terms of their voluntary exchange are reasonable, and specifically to infer that price is close to marginal cost, such that the seller makes only a normal return on its investment." *Tejas Power Corp. v. FERC*, 908 F.2d 998, 1004 (D.C. Cir. 1990); *see Louisiana Energy & Power Auth. v. FERC*, 141 F.3d 364, 365 (D.C. Cir. 1998); *California ex rel. Lockyer v. FERC*, 383 F.3d 1006, 1013 (9th Cir. 2004); *see also Elizabethtown Gas Co. v. FERC*, 10 F.3d 866, 870 (D.C. Cir. 1993) (approving market-based pricing under the Natural Gas Act).

Even though market-based tariffs do not identify a specific price for electricity, the Commission is still statutorily bound to ensure that the resulting rates are just and reasonable. To do that, the Commission requires assurance for any market-based tariff that the seller cannot exercise anticompetitive market power. *See Blumenthal v. FERC*, 552 F.3d 875, 882 (D.C. Cir. 2009). More specifically, the Commission has laid out three mandatory conditions that must exist for a market-based tariff to be approved.

First, the seller of electricity must demonstrate to the Commission's satisfaction that it and its affiliates either lack, or have adequately mitigated, any horizontal or vertical market power, and the seller cannot erect any barriers to entry against potential competitors. *See* Market-Based Rates ¶¶ 3, 791, 72 Fed. Reg. at 39,906, 39,997; 18 C.F.R. § 35.37; *Morgan Stanley*, 554 U.S. at 537; *Louisiana Energy*, 141 F.3d at 365; *see also Elizabethtown Gas*, 10 F.3d at 870–871.[1]

---

[1] The Commission has defined "market power" in this context as a seller's ability to "significantly influence price in the market by withholding service and excluding competitors for a significant

Second, some sellers participate in organized regional markets for electrical power operated by Regional Transmission Organizations (described in more detail below). Sellers in those markets "must also abide by additional rules" contained in the tariffs filed by the Regional Transmission Organizations. Market-Based Rates ¶ 4, 72 Fed. Reg. at 39,906. Those rules are "designed to help ensure that market power cannot be exercised in those organized markets and include additional protections," such as mitigation measures, when "appropriate to ensure that prices in those markets are just and reasonable." *Id.*

Third, the Commission must continually perform "ongoing oversight of market-based rate authorizations and market conditions[.]" Market-Based Rates ¶ 5, 72 Fed. Reg. at 39,906; *Blumenthal*, 552 F.3d at 882 (approving the Commission's "reasonabl[e] reli[ance] on its continuing oversight of the market to guard against potential abuses of market power"). This oversight includes reviewing periodic reports that sellers and Regional Transmission Organizations are required to file, detailing their activities. *See Blumenthal*, 552 F.3d at 882–883; 18 C.F.R. §§ 35.10b, 35.28(g)(4), 35.37(a)(1), 35.42.

As relevant here, sellers must file quarterly transaction reports containing "(a) a summary of the contractual terms and conditions in every effective service agreement for market-based power sales; and (b) transaction information for * * * market-based power sales during the most recent calendar quarter[.]" Refinements to Policies & Procedures for Market-Based Rates for Wholesale Sales of Elec. Energy, Capacity &

period of time." *California Indep. Sys. Operator Corp.*, 126 FERC ¶ 61150, at 33 n.123 (Feb. 20, 2009) (quoting *Citizens Power & Light Corp.*, 48 FERC ¶ 61,210, at 7 (Aug. 8, 1989)); *Louisiana Energy*, 141 F.3d at 365 n.1.

Ancillary Servs. by Pub. Utilities, 153 FERC ¶ 61,065, at 6–7 (Oct. 16, 2015). Sellers must also notify the Commission any time they undergo a change of status "that would reflect a departure from the characteristics the Commission relied upon in granting market-based rate authority[.]" *Id.* at 7. Certain large sellers must file updated market power analyses every three years. *Id.*

The Commission also requires the Regional Transmission Organizations to submit data about their markets on an ongoing basis, which helps the Commission "detect anti-competitive or manipulative behavior, or ineffective market rules, thereby helping to ensure just and reasonable rates." Enhancement of Elec. Market Surveillance & Analysis through Ongoing Elec. Delivery of Data from Reg'l Transmission Orgs. & Indep. Sys. Operators, 139 FERC ¶ 61,053, at 2 (April 19, 2012); 18 C.F.R. § 35.28(g)(4).

Of course, the mere filing of reports by sellers and Regional Transmission Organizations does not itself satisfy the Commission's monitoring obligations. *See California ex rel. Harris v. FERC*, 784 F.3d 1267, 1273 (9th Cir. 2015). Rather, the Commission must actively review those reports and assess on an ongoing basis whether the market remains competitive. This active supervision enables the Commission to take action to "address seller market power or modify rates." Market-Based Rates ¶ 5, 72 Fed. Reg. at 39,906; *Montana Consumer Counsel v. FERC*, 659 F.3d 910, 919 (9th Cir. 2011) (upholding system of market-based tariffs because the Commission "has confirmed that it will monitor the data to ensure that the reported transactions are consistent with the data expected of a competitive, unmanipulated market").

For instance, the Commission's monitoring of transaction data may lead it to revoke a seller's authorization to use market-

based tariffs if the Commission concludes that the seller may have gained market power since its original authorization. Market-Based Rates ¶ 5, 72 Fed. Reg. at 39,906. Alternatively, the Commission could commence an investigation into possible tariff violations or market manipulation, and if it finds a violation, the Commission could seek remedies including disgorgement, refunds, and civil penalties. *Id.*

Whatever enforcement path is chosen, the core requirement is that the Commission conduct an "active ongoing review" of the performance of market-based tariffs based on the filed reports. *Harris*, 784 F.3d at 1273. The reporting requirements—and the continual vigorous monitoring those reports enable—are "integral" to a market-based tariff "pass[ing] legal muster[.]" *Lockyer*, 383 F.3d at 1015; *see also* Market-Based Rates ¶ 955, 72 Fed. Reg. at 40,017.

The Commission's regulations also create mechanisms for the public to participate in enforcing these requirements. For instance, interested parties may file protests to tariff filings, and may seek to intervene in the tariff-approval proceedings before the Commission. *See* 18 C.F.R. §§ 35.8, 385.211, 385.214. In addition, third parties may file complaints with the Commission alleging violations of Commission rules or orders. 18 C.F.R. § 385.206; *see, e.g.*, *California ex rel. Lockyer*, 99 FERC ¶ 61247, at 14–15 (May 31, 2002) (denying motions to dismiss complaint that "challenge[d] sellers' quarterly compliance with the Commission's reporting requirements"), *rev'd and remanded on other grounds by Lockyer*, 383 F.3d at 1018; *see also* 16 U.S.C. § 824e(a) (permitting complaints alleging unjust and unreasonable rates).

## C

In many parts of the country not dominated by single, vertically integrated utilities, the electricity system is managed

in part by Regional Transmission Organizations and Independent System Operators (collectively, "Transmission Organizations"). Transmission Organizations serve multiple functions, including operating the grid in particular geographic areas, constantly balancing supply and demand, and ensuring a reliable transmission system. *See* FERC, ENERGY PRIMER: A HANDBOOK FOR ENERGY MARKET BASICS 61 (April 2020), https://www.ferc.gov/sites/default/files/2020-06/energy-primer-2020_Final.pdf (last accessed July 30, 2021). Most relevant here, Transmission Organizations also establish markets in which electricity generators can sell their electricity wholesale to distributors and other purchasers.

Some Transmission Organizations also run markets for electrical capacity. By way of reminder, in a capacity market, distributors of electricity purchase commitments from generators to produce set amounts of electricity in the future. *Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 659 (D.C. Cir. 2017).[2] With those commitments in hand, the electricity distributor can meet high demands for electricity by calling on the generators to produce it when the need arises. *Id*. Purchasing capacity, in other words, ensures that distributors can reliably meet predicted peak power demands in an upcoming month, season, or year.

**D**

Midcontinent Independent System Operator ("MISO") is a Transmission Organization that, among its other responsibilities, conducts annual capacity auctions in portions of fifteen states in the Midwest and South.

---

[2] Capacity can sometimes also be purchased from consumers who promise to forgo consuming a set amount of electricity in the future. *Advanced Energy Mgmt. Alliance*, 860 F.3d at 659.

For purposes of the auctions, MISO's operational area is divided into nine separate regional "zones." For each zone, MISO determines how much capacity will be required. It also determines a "local clearing requirement," which is "the minimum amount of procured capacity that must be physically located within the Zone (rather than imported [from another Zone or region])" to meet anticipated need. *Public Citizen, Inc.*, 168 FERC ¶ 61,042, at 2 (July 19, 2019) (J.A. 62).

In the auction, electricity generators offer to sell set amounts of capacity at specific prices. *Cf. Advanced Energy Mgmt. Alliance*, 860 F.3d at 659–660. MISO accepts offers, beginning with the lowest, until the zone's capacity requirements are met. The price of the last increment of capacity needed to meet the zone's capacity requirements is the "auction clearing price" for that zone, and all the capacity for that zone is then purchased at that price.

In addition to those basic rules, MISO applies specific rules intended to mitigate the risk that, if the marketplace is insufficiently competitive, a seller might exercise market power, resulting in an unjust and unreasonable rate. In the auction for the 2015-2016 planning year—the year at issue in this case—several such rules were in effect.

First, offers to sell capacity could not exceed the "cost of new entry" in a particular zone—that is, the estimated cost of building a new power plant to provide capacity in that zone. *Public Citizen, Inc.* ¶ 33 (J.A. 76–77).

Second, to prevent generators from selling capacity at prices substantially higher than the amount they would receive from exporting their capacity to another market, MISO calculated an "initial reference level" that was "based on the estimated opportunity cost" of selling capacity in MISO rather than exporting it to a neighboring region. *Public Citizen, Inc.*

¶ 34 (J.A. 77). Specifically, MISO set the initial reference level by estimating how much generators could earn by exporting capacity to PJM Interconnection, a Transmission Organization region that covers portions of thirteen states in the Midwest and Mid-Atlantic, rather than selling it to MISO. Simplifying somewhat, if an offer exceeded the sum of (i) the initial reference level and (ii) ten percent of the cost of new entry—a sum known as the "conduct threshold"—the offer was automatically lowered to the initial reference level. *Id.* ¶ 33 (J.A. 77).

**E**

This case involves a seemingly anomalous result in the 2015 Auction for MISO's Zone 4—a zone that covers a large portion of Illinois. For that auction, MISO had calculated the cost of new entry for Zone 4 at $247.40 per megawatt (MW)-day, and the initial reference level (again, based on the estimated opportunity cost of not selling energy to PJM) at $155.79 per MW-day. Based on these figures, the operating rule to ensure fair prices in the auction was that any offer over $180.53 per MW-day ($155.79 plus ten percent of $247.40) would be automatically reduced to $155.79.

The Auction took place in April 2015, and when the dust settled, the auction clearing price in most of the zones was quite uniform. Zones 1, 2, 3, 5, 6, and 7 all cleared at $3.48 per MW-day. Similarly, Zones 8 and 9 cleared at $3.29 per MW-day. But in Zone 4, the auction clearing price was far higher—$150 per MW-day. That was not only more than 40 times the price set in the other zones, but it was also out of keeping with historical rates in Zone 4. For example, in MISO's immediately preceding 2014-2015 auction, the price in Zone 4 (along with five other zones) was $16.75 per MW-day. Similarly, in MISO's capacity auction for the 2013-2014

planning year, the clearing price for Zone 4 (and for the entire region) was $1.05 per MW-day.

The month after the 2015 Auction, four complaints were filed with the Commission challenging the exceptionally high Zone 4 auction results. The complaints were filed by (1) Public Citizen, a public interest and consumer protection organization with members in Zone 4; (2) the State of Illinois; (3) Southwestern Electric Cooperative, an electric distribution cooperative that serves rural consumers in Illinois; and (4) Illinois Industrial Energy Consumers, an association of large industrial consumers in Illinois.

Public Citizen, the State of Illinois, and Southwestern Electric Cooperative alleged that the 2015 Auction had resulted in electricity rates for Zone 4 that were unjust and unreasonable in violation of Section 206 of the Federal Power Act, 16 U.S.C. § 824e. The State of Illinois explained that the $150 per MW-day capacity price would result in an additional $102.1 million in total capacity charges in the coming year, and that the average residential customer in Zone 4 would pay an additional $131 that year.

Those complainants pointed the finger at Dynegy, a power company in Illinois that, in 2013, had purchased four additional power plants in Zone 4. The State of Illinois alleged that Dynegy had become a "pivotal supplier" for Zone 4, meaning that Zone 4 could not meet its local clearing requirement without purchasing Dynegy's capacity. As a result, as the auction rules were designed, Dynegy could offer—and would receive—any price it wanted in the auction, so long as that price was beneath the conduct threshold set by the auction rules. In other words, Dynegy could exercise market power and garner an unreasonably high price for its electricity because the demand for capacity could not be met without it.

15

Public Citizen alleged that the unjust and unreasonable rates resulted not only from Dynegy's exercise of market power, but also from Dynegy's "illegal market manipulation of the auction through withholding" competitive offers during the auction to drive the price up or "other illegal market actions[.]" J.A. 152–153. The State of Illinois and Southwestern similarly requested that the Commission investigate Dynegy for illegal market manipulation.

Public Citizen separately argued that, notwithstanding any filed market-based tariffs, all auction results "must be reviewed after-the-fact * * * to determine whether they actually produce just and reasonable rates." J.A. 153.

Lastly, several complaints attacked the "initial reference level" set out in MISO's tariff as part of the annual auction rules. The complaints alleged that the existing reference level "[did] not appropriately reflect the opportunity cost of MISO capacity resources because it overstate[d] the opportunity to sell capacity to PJM." J.A. 921.

**F**

The Commission responded to these complaints in a series of orders, three of which are relevant here.

**1**

In its first order, issued in December 2015, the Commission addressed only the portions of the complaints that involved prospective challenges to the auction provisions of MISO's tariff. *Public Citizen, Inc.*, 153 FERC ¶ 61,385, at 3 (Dec. 31, 2015) ("2015 Order") (J.A. 910). The Commission focused first on those claims because it wanted to act quickly "given the limited amount of actionable time prior to the 2016/2017 Auction[.]" *Id.*

The Commission granted the complaints in part and denied them in part. As relevant here, the Commission determined that "current provisions in the Tariff associated with calculating Initial Reference Levels and Local Clearing Requirements are no longer just and reasonable for prospective application." 2015 Order ¶ 3 (J.A. 910).

Recall that the initial reference level reflected the amount of money that generators could have earned by selling their electricity into PJM, a neighboring market, rather than selling it in the MISO auction. The initial reference level helped set the upper limit on permissible offers into MISO's auction, based on the assumption that offers below the initial reference level were necessarily competitive because a generator could have sold its capacity to PJM at that same price.

But the Commission determined that assumption was no longer valid, and so it was no longer "appropriate to continue to base the Initial Reference Level * * * on the opportunity cost" of not selling capacity into PJM. 2015 Order ¶ 86 (J.A. 941). Two findings underlay that conclusion.

First, the Commission found that the rules of the PJM marketplace were changing in ways that made it harder to compare MISO prices with PJM prices. The Commission had recently approved changes to PJM's capacity market that required capacity sellers to be compensated through a more complicated pricing model, including additional payments or penalties based on performance during peak hours. This change meant that, by the 2020-2021 planning year when the transition to the new rules would be fully complete, "PJM and MISO [would] be procuring different capacity products," and "simply using prices from PJM[] * * * [would] inaccurately estimate the opportunity cost of [not] selling capacity into PJM in future Planning Years." 2015 Order ¶ 88 (J.A. 941).

Second, the Commission concluded that, contrary to MISO's assumption that generators could always sell their electricity capacity into PJM, there was neither sufficient demand in PJM nor sufficient transmission availability into PJM to make those sales possible. The Commission found that, in the 2014-2015 planning year, MISO granted only a small fraction of requests for transmission services from Zone 4 into PJM. *See* 2015 Order ¶ 89 (J.A. 942) ("[O]nly 200 MW of the 3,650 MW of monthly firm point-to-point transmission service requests were granted."). Similarly, capacity sales per day from MISO into the relevant PJM market were only 64.3 MW in 2014-2015 and 12.3 MW in 2015-2016. *Id.* ¶ 90. In other words, "in recent years, MISO capacity resources made limited sales into the PJM replacement capacity market[.]" *Id.* As a whole, this evidence demonstrated that "the opportunity [for MISO generators] to make * * * sales [into PJM] is limited due to both the limited demand for replacement capacity in PJM and the limited ability to attain transmission service from MISO to PJM." 2015 Order ¶ 91.

Given those findings, the Commission ruled that MISO's calculation of the initial reference level under its tariff was no longer just and reasonable. That is because opportunity cost is a valid consideration in structuring market prices only if the opportunity is "legitimately available to a substantial share of the market," which it was not. 2015 Order ¶ 92 (J.A. 943). With no other evidence available to estimate the amount of money a generator would be forgoing by selling capacity in MISO rather than exporting it elsewhere, the Commission ordered that, going forward, the initial reference level must be set at $0 per MW-day (rather than the $155.79 initial reference level set by MISO for the 2015 Auction). *Id.* ¶ 93.

The Commission separately determined that MISO's tariff provisions also miscalculated the amount of capacity that

needed to be procured from power plants located within each MISO zone (that is, the local clearing requirement). In essence, the Commission held that when MISO calculates the amount of capacity that must be generated within a zone to ensure reliability, it must consider the consequences for the grid when capacity generated locally is exported to other regions, creating so-called "counter-flows." 2015 Order ¶¶ 145–147 (J.A. 963–964). Since MISO's tariff did not properly take these counter-flows into consideration in calculating the local clearing requirement, the Commission determined that MISO's methodology was unjust and unreasonable, and ordered prospective changes to the local clearing requirement calculations. *Id.* ¶¶ 3, 148.

The Commission's 2015 Order was explicit that the complaints' other arguments about the legality of the 2015 Auction remained under consideration. 2015 Order ¶ 4 (J.A. 910). It also advised that the Commission's Office of Enforcement had opened "a formal, non-public investigation into whether market manipulation occurred before or during" the 2015 Auction. *Id.*

**2**

Three and a half years later, a divided Commission denied the complaints' remaining challenges to the 2015 Auction.

The Commission majority ruled that the results of the 2015 Auction for Zone 4 were "just and reasonable." *Public Citizen, Inc.*, 168 FERC ¶ 61,042, at 2 (July 19, 2019) ("2019 Order") (J.A. 62). It began by announcing that its investigation into potential market manipulation in the 2015 Auction had been closed. *Id.* ¶ 30 (J.A. 76). The Commission explained that the investigation had spanned more than three years, during which the Office of Enforcement reviewed over 500,000 pages of documents and took seventeen days of testimony from eleven

witnesses. "Based on a review of the investigation," the Commission found that pricing in the 2015 Auction "did not violate the Commission's regulations regarding market manipulation," and so "no further action [was] appropriate to address the allegations of market manipulation raised in the complaints." *Id.* ¶ 32.

The Commission next rejected the contention that Dynegy had exercised market power in the 2015 Auction that caused an unjust or unreasonable auction clearing price in Zone 4. The only reason given by the Commission for finding no improper exercise of market power was that "MISO conducted the 2015/16 Auction in compliance with the MISO Tariff," which had been "designed to mitigate the exercise of market power and result in a just and reasonable rate." 2019 Order ¶ 84 (J.A. 104–105). Dynegy's offers, the Commission observed, were "competitive" because they were less than the "conduct threshold" of $180.53 per MW-day that was calculated based on the initial reference level. *Id.* ¶ 85 (J.A. 106). The Commission added that "an Auction Clearing Price is not unjust and unreasonable because it is higher than expected." *Id*. ¶ 84 (J.A. 105). The Commission also noted that there was no evidence in the record that Dynegy had in any way violated the terms of MISO's tariff.

Also relevant here, the Commission rejected Public Citizen's argument that the Commission must review individual final auction prices across the board for justness and reasonableness before those prices could go into effect. 2019 Order ¶ 89 (J.A. 107). The Commission stated that, while it was required to enforce reporting requirements "that enable the Commission to evaluate whether rates are just and reasonable[,]" it was not required "to make an affirmative finding that a rate is just and reasonable before allowing the rate to go into effect." *Id.* The Commission further explained

that, for purposes of the requirement that sellers file their rates with the Commission, "the rate on file with the Commission is the Tariff describing the Auction procedures, not the prices that may change over time." *Id.*

Then-Commissioner (now Chairman) Glick dissented. In his view, "the fact that MISO and the individual market participants appear to have followed the relevant tariff language does not respond to allegations that the resulting rates are unjust and unreasonable as a result of market manipulation." 2019 Order (Glick, Comm'r, dissenting) ¶ 2 (J.A. 117). He added that the investigation into market manipulation had been terminated by the Commission's chairman without a vote by the full Commission. *Id.* ¶ 1. He expressed his personal disagreement with that decision, based on his belief "that the evidence uncovered to date was more-than-sufficient to justify continuing the enforcement process." *Id.* ¶ 4. He added that, regardless of the investigation, the Commission's Order "does not provide even the scantest reasoning to support its finding that the nearly 1,000 percent year-over-year increase in the MISO Zone 4 capacity price had nothing to do with market manipulation." *Id.* ¶ 5. For those reasons, he did "not believe we can say with any confidence that the 2015 auction was not subject to market manipulation." *Id.* ¶ 6.

**3**

Public Citizen sought rehearing of the Commission's 2019 Order. It argued that the Commission had failed both "to explain the basis for its determination that Dynegy did not engage in manipulative practices," and "to consider whether the rates themselves [were] just and reasonable[.]" J.A. 1035. In Public Citizen's view, the Commission had wrongly "rel[ied] solely on [the rates] having been established in

compliance with a previously approved market-based rate-setting mechanism[.]" J.A. 1035. In particular, Public Citizen pointed out that "the Commission itself ha[d] already determined [in its 2015 Order] that continued use of the [tariff's] auction mechanisms used in the 2015/16 auction would be unjust and unreasonable[.]" J.A. 1035. Since the Commission had "never determined that the tariff's auction provisions themselves were just and reasonable at the time of the 2015/16 auction," it had "failed to explain how it could conclude that compliance with those provisions necessarily resulted in just and reasonable rates." J.A. 1036. Public Citizen also objected to what it characterized as the Commission's failure to explain its conclusion that Dynegy had not committed market manipulation.

The Commission denied rehearing, again over a dissent from then-Commissioner Glick. Addressing first the allegations of market manipulation, the Commission noted that it "has discretion on whether and how to explore the possibility that market manipulation has occurred." *Public Citizen, Inc.*, 170 FERC ¶ 61,227, at 6 (March 19, 2020) ("Rehearing Order") (J.A. 130) (citing *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). The Commission added that Public Citizen had "fail[ed] to accurately articulate and address the definition of 'market manipulation'" in the Act. *Id.* at 7. And it asserted that Public Citizen "ha[d] not met its burden" to show that "activity meeting that definition occurred and resulted in rates that are unjust and unreasonable." *Id.* at 7–8.

Turning to Public Citizen's argument that the Commission was required to assess whether the auction prices were just and reasonable, the Commission held that the argument "rests on a fundamental misunderstanding of the Commission's market-based rate program." Rehearing Order ¶ 16. The Commission then concluded that, because Dynegy had received prior

approval to charge market-based rates from the Commission, and because Public Citizen did not allege that Dynegy had failed to comply with its reporting obligations, the sales "pursuant to Dynegy's market-based rate tariff at the time of the 2015/16 Auction were appropriately made." *Id.* ¶ 18.

Finally, with respect to the justness and reasonableness of the 2015 Auction, the Commission rejected Public Citizen's reliance on the Commission's 2015 Order directing prospective changes to MISO's tariff. The Commission reasoned that its 2015 Order's finding that the tariff was unjust and unreasonable going forward was based on "changes to the PJM capacity market, including future changes to the capacity market construct." Rehearing Order ¶ 22 (J.A. 135–136). The Commission reasoned that those changes would only affect the opportunity costs for MISO generators "going forward," so they were properly considered only prospectively, and did not undermine the Commission's conclusion that the 2015 Auction was based on a "just and reasonable approach to mitigating anticompetitive behavior in the MISO capacity market." *Id.*

Dissenting again, Commissioner Glick repeated his concern that the Commission "continues to sidestep the key question" of whether the 2015 Auction results "were just and reasonable in light of the allegations of market manipulation by Public Citizen and others." Rehearing Order (Glick, Comm'r, dissenting) ¶ 1 (J.A. 137).

Public Citizen timely petitioned this court for review of both the 2019 Order and the 2020 Rehearing Order.

**II**

We have jurisdiction under the Federal Power Act, 16 U.S.C. § 825*l*(b), and review Commission orders under the arbitrary and capricious standard. *West Deptford Energy, LLC*

*v. FERC*, 766 F.3d 10, 17 (D.C. Cir. 2014). To that end, we must determine "whether the Commission's orders examined the relevant data and articulated a rational connection between the facts found and the choice made." *Id.* (quotation omitted).

## III

Public Citizen raises three challenges to the Commission's orders. First, Public Citizen argues that the Commission failed to meet its obligation to ensure just and reasonable rates because it did not review the prices resulting from the 2015 Auction before those prices went into effect. Second, Public Citizen argues that the Commission was arbitrary and capricious in failing to adequately explain its decision to close its investigation into whether Dynegy engaged in market manipulation. Third, Public Citizen argues that the Commission failed to adequately explain its conclusion that the results of the 2015 Auction were just and reasonable.

We deny Public Citizen's petition with respect to the first two arguments. But we agree that the Commission's decision that the 2015 Auction results were just and reasonable solely because the auction process complied with the filed tariff was unreasoned on this record. So we grant the petition in part and remand to the Commission.

## A

Public Citizen's first contention is that Section 205 of the Federal Power Act requires the Commission to give its affirmative approval to each individual market-based price resulting from an auction for electricity or electrical capacity before that price can go into effect. That is incorrect.

Market-based rate regulation is based on the premise that, "[i]n a competitive market, where neither buyer nor seller has

significant market power, * * * the terms of their voluntary exchange are reasonable, and * * * [the] price" they negotiate will be "close to marginal cost, such that the seller makes only a normal return on its investment." *Tejas Power Corp.*, 908 F.2d at 1004. On that understanding, we have held that the Commission can rationally allow markets to set "just and reasonable" prices as long as the Commission takes the necessary steps to ensure that market participants cannot wield anticompetitive market power. *See Blumenthal*, 552 F.3d at 882; *Louisiana Energy*, 141 F.3d at 365; *Elizabethtown Gas*, 10 F.3d at 870–871.

The Commission has developed a two-part supervisory process for ensuring that market rates are just and reasonable, and we have held that this process satisfies the Commission's statutory obligations under Section 205 of the Federal Power Act. *See* 16 U.S.C. § 824d. First, before approving the use of a market-based tariff, the Commission must make a finding that the seller lacks or has adequately mitigated market power. *Blumenthal*, 552 F.3d at 882. Second, the Commission must conduct "continuing oversight" of the market by reviewing the mandatory transaction reports filed with it to make sure that they corroborate "the continued competitiveness" of the market. *Id.* at 882–883.

This second step is just as critical as the first. *See Lockyer*, 383 F.3d at 1014; *Harris*, 784 F.3d at 1275. The Commission must review auction results—including prices—as part of its obligation to conduct "active ongoing review" of markets and market participants. *Harris*, 784 F.3d at 1273. But in conducting that active monitoring, the Commission examines auction prices not to determine whether the prices themselves are intrinsically just and reasonable, but instead "to ensure that the reported transactions are consistent with the data expected of a competitive, unmanipulated market." *Montana Consumer*

*Counsel*, 659 F.3d at 919; *see* Market-Based Rates ¶ 117, 72 Fed. Reg. at 39,919 (Commission noting that, "as part of our ongoing monitoring activities, we examine the [transaction] data in an effort to identify whether market prices may indicate an exercise of market power"); *see also* Market-Based Rates ¶ 5, 72 Fed. Reg. at 39,906 (affirming that the Commission's review of transactions includes looking out for signs of market manipulation). So while prices provide important and relevant evidence of the market's functioning, prices are not themselves the object of the Commission's inquiry.

This reasonable regulatory regime gives no quarter to Public Citizen's demand that the Commission must examine and approve every individual price resulting from every single auction to reconfirm that the price is "just and reasonable" in its own right. The whole premise of the Commission's market-based system is that a properly competitive market will necessarily produce just and reasonable prices. The Commission satisfies its statutory obligations under Section 205 by giving sellers *ex ante* approval for market-based pricing so long as (1) sellers participating in regional markets obey the rules designed to ensure fair and competitive markets, and (2) the Commission's continuing and vigilant monitoring of transaction reports verify that the markets work properly when the rubber meets the road. Public Citizen's desire to pile on another layer of agency review ignores longstanding precedent upholding this regulatory scheme. *See Elizabethtown Gas*, 10 F.3d at 870 (In a competitive market, the Commission can "rely upon market-based prices in lieu of cost-of-service regulation to assure a 'just and reasonable' result."); *Lockyer*, 383 F.3d at 1013 (concluding that market-based tariffs satisfy the Federal Power Act given "the dual requirement of an ex ante finding of the absence of market power and sufficient post-approval reporting requirements") (emphasis omitted).

Public Citizen insists that the statute's multiple references to "rates and charges" indicates that sellers must seek Commission approval of all auction prices. *See* 16 U.S.C. § 824d(a), (c), (d), (e).[3] But what those references to rates and charges require is that they be just and reasonable. *See also Montana Consumer Counsel*, 659 F.3d at 921 ("[T]he 'rate' filed by authorized power wholesalers is the 'market rate,' and that rate does not 'change' even though the prices charged by the wholesalers may rise and fall with the market."); *Lockyer*, 383 F.3d at 1014 ("[T]here is nothing inherent in the general concept of a market-based tariff that violates the [statute.]"). Nothing in the statute dictates the precise methodology the Commission must use to ensure the justness and reasonableness of rates, whether through individualized review or through reviewing and monitoring the process by which rates are computed. *See Elizabethtown Gas*, 10 F.3d at 870 (citing *Mobil Oil Exploration & Producing Se. Inc. v. United Distribution Cos.*, 498 U.S. 211, 214 (1991)).

Public Citizen points us to *Farmers Union Central Exchange v. FERC*, 734 F.2d 1486 (D.C. Cir. 1984), but that case is of no help to its argument. The Commission's protections of *ex ante* review, approval of the market design, and active post-approval monitoring do not involve "largely undocumented reliance on market forces as the principal means of rate regulation," which was the problem in *Farmers*. *Id*. at

---

[3] Paragraph (a) of Section 824(d) requires that all "rates and charges" be just and reasonable. 16 U.S.C. § 824d(a). Paragraph (c) requires utilities to file schedules of all "rates and charges" with the Commission. *Id.* § 824d(c). Paragraph (d) prohibits utilities from changing any "rate" or "charge" without sixty-days' notice to the Commission and the public, "[u]nless the Commission otherwise orders[.]" *Id.* § 824d(d). And paragraph (e) permits the Commission to suspend a new "rate" or "charge" under certain circumstances. *Id.* § 824d(e).

1508; *see Blumenthal*, 552 F.3d at 882. *TransCanada Power Marketing Ltd. v. FERC*, 811 F.3d 1, 4, 13 (D.C. Cir. 2015), is also inapt because it did not involve a competitive market-based rate system. And *Public Citizen, Inc. v. FERC*, 839 F.3d 1165 (D.C. Cir. 2016), concerned a settlement agreement that specifically required the Commission to perform a "thorough review" of actual auction-clearing prices, *id.* at 1167, a requirement that has no analogue here.

For all of those reasons, we reject Public Citizen's argument that the Commission was required under Section 205 to review the resulting auction prices themselves to determine whether they were "just and reasonable." *See* 16 U.S.C. § 824d.

**B**

Public Citizen next challenges the Commission's conclusory statement that Dynegy did not engage in market manipulation, which the Commission made in explaining its wholly discretionary decision to close its investigation into Dynegy. Because that brief statement was made for the sole purpose of explaining the Commission's decision not to pursue an enforcement action, we have no power to review it.

It has long been settled that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831; *see* 5 U.S.C. § 701(a)(2) (excluding from judicial review agency actions "committed to agency discretion by law"). In deciding whether to bring an enforcement action, an agency must not only determine whether a violation of the law occurred, but also whether "agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's

overall policies, and, indeed, whether the agency has enough resources to undertake the action at all." *Chaney*, 470 U.S. at 831.

In this case, the Commission conducted a lengthy investigation into whether the 2015 Auction's localized rate spike was the product of market manipulation. The Commission's investigation spanned more than three years, produced 500,000 pages of documents, and involved seventeen days of testimony from eleven witnesses. 2019 Order ¶ 31 (J.A. 76). After that, the Commission concluded that "the conduct investigated did not violate the Commission's regulations regarding market manipulation[,]" and for that reason, "no further action [was] appropriate to address the allegations of market manipulation raised in the complaints." *Id.* ¶ 32 (J.A. 76).

That type of Commission decision not to pursue further investigation or enforcement "is a paradigmatic instance of an agency exercising its presumptively nonreviewable enforcement discretion." *Baltimore Gas & Elec. Co. v. FERC*, 252 F.3d 456, 460 (D.C. Cir. 2001). That the Commission offered a brief and non-substantive passing word of explanation—whether on the question of liability or resource limitations—by itself does not open the door to judicial review of the non-enforcement decision.

Public Citizen acknowledges that it can neither "dictate the agency's investigative procedures" nor "seek[] review of an exercise of enforcement discretion." Public Citizen Br. 52. It insists instead that it challenges the Commission's "substantive ruling," in response to complaints, that Dynegy's conduct did not constitute market manipulation. *Id.* The Commission's enforcement decision, Public Citizen says, "rested entirely on

this resolution of the *merits* of the claim[,]" and "not on the exercise of prosecutorial discretion." *Id.*

But the exercise of prosecutorial discretion is not infrequently informed by the agency's view of the merits—whether a violation took place, or whether it could be proved. *See Chaney*, 470 U.S. at 831 (including "whether a violation has occurred" among the factors an agency considers in making an enforcement decision).

Nor is there any "law to apply" here*. Chaney*, 470 U.S. at 834–835. Under *Chaney*, the presumption of nonreviewability can be defeated if Congress has provided law for the court to apply. That would happen, for example, if Congress had "indicated an intent to circumscribe agency enforcement discretion, and had provided meaningful standards for defining the limits of that discretion." *Id.* at 834. That exception does not apply here because nothing in the Federal Power Act reins in the Commission's enforcement discretion or provides a meaningful standard for reviewing its unexplained conclusion. *See* 16 U.S.C. § 825e ("[I]t shall be the duty of the Commission to investigate the matters complained of in such manner and by such means as it shall find proper."); *Public Utils. Comm'n of State of Cal. v. FERC*, 462 F.3d 1027, 1050 (9th Cir. 2006) ("[The Commission] enjoys broad discretion in the management of its own [18 C.F.R.] § 1b prosecutorial investigations.").[4]

---

[4] In this way, the Commission's discretionary enforcement decision to close an investigation under Section 306 of the Act, 16 U.S.C. § 825e, is quite different from the substantive adjudicative decisions the Commission must make under Section 206, 16 U.S.C. § 824e(a), in response to complaints about whether particular rates are just and reasonable.

In short, under the Federal Power Act, we cannot review either the Commission's discretionary decision to close its Section 222 investigation into Dynegy, or the fleeting explanation the Commission gave for its action.

## C

Public Citizen fares better with its argument that the Commission failed to explain adequately its conclusion that the results of the 2015 Auction for Zone 4 were just and reasonable. *See* 2019 Order ¶ 2. In addressing that issue, the Commission fell far short of the type of reasoned explanation that the law requires. Most notably, the Commission failed to reconcile its prospective holding that the tariff could no longer protect against anticompetitive behavior with its conclusion that the conspicuously uneven 2015 results—obtained under the same flawed tariff terms—were not similarly infected. Nor did the Commission provide any explanation for its determination that market manipulation did not lead to unjust and unreasonable rates.

## 1

In its December 2015 Order, the Commission ruled that some of MISO's tariff provisions—those used to calculate the initial reference level and local clearing requirements—were "no longer just and reasonable for prospective application[.]" 2015 Order ¶ 3 (J.A. 910). Most relevant here, the Commission determined that it made no sense to estimate MISO sellers' opportunity costs by reference to the PJM market because of both the demonstrated lack of past demand and transmission availability for generators located within MISO to sell their energy capacity into PJM, as well as future changes to the PJM marketplace. *Id.* ¶ 92. At bottom, that meant that the tariff's scheme for setting price parameters no longer protected against

sellers obtaining disproportionate prices through exercises of market power or market manipulation.

Yet in its 2019 Order, the Commission ruled that the sharply disparate rates produced in the 2015 Auction by that same tariff—applying its no-longer-valid opportunity-cost assumptions—were just and reasonable. In doing so, the Commission made no effort at all to reconcile its ruling with its 2015 Order's findings that the tariff relied on flawed pricing assumptions. Not until its rehearing decision did the Commission even touch upon the issue. Even then, all the Commission said was that the prospective changes ordered in the 2015 Order rested exclusively on expected future changes to the PJM market. Rehearing Order ¶ 22 (J.A. 135–136). Since Dynegy's auction offers were permissible under the then-governing tariff, the Commission added, the results of that Auction were necessarily just and reasonable. *Id.* ¶¶ 22, 23.

That will not do. The Commission's 2015 Order listed future changes to PJM as only one of the reasons for finding the tariff no longer just and reasonable. 2015 Order ¶¶ 87–88 (J.A. 941–942). The Commission also cited present-day problems with the tariff's assumptions, including the limited opportunity, as of 2015, for MISO generators to sell into PJM due to both limited demand in PJM and the limited ability to obtain transmission service into PJM. *Id.* ¶¶ 89–92. Those latter two determinations rested on evidence and data about demand and transmission availability in the 2014-2015 and 2015-2016 planning years. *Id.* ¶¶ 89–91. The Commission, in short, rested its invalidation of the tariff in material part on evidence that, on its face, applies just as much to the 2015 Auction as to future auction years.

That apparent flaw directly affected the boundaries within which rates were set. For example, without those impugned

assumptions about opportunity costs, the initial reference level in 2015 likely could have been set at $0 per MW-day, just as the Commission ordered for future auctions. Instead, based on opportunity costs that the Commission's 2015 Order directly called into question, the initial reference level was set at $155.79 per MW-day. With an initial reference level of $0, generators like Dynegy would have been limited to offering capacity at a price of no more than roughly $25 per MW-day, and thus would have been unable to submit the 600% higher offers that they did in the 2015 Auction. *See* 2015 Order ¶ 93.[5] Because this apparent flaw in the 2015 Auction rules led to an outlier auction clearing price of $150 per MW-day, the Commission was obligated to explain why its opportunity cost analysis in the 2015 Order did not require the conclusion that the 2015 Auction results—that were predicated on the same flawed opportunity-cost assumption—were not unjust and unreasonable.[6]

---

[5] At least, to submit such offers, the companies would have had to request a facility-specific reference level and support that request with evidence of an individual facility's distinctive going-forward costs.

[6] We reject intervenor Vistra's suggestion that Public Citizen failed to preserve this issue on rehearing. Public Citizen's rehearing request argued that the Commission's bare reliance on the 2015 Auction's compliance with MISO's tariff to demonstrate the justness and reasonableness of the auction results was undermined by the Commission's own prior determination that the tariff provisions were no longer just and reasonable. J.A. 1035–1036 ("That the Commission itself has already determined that continued use of the auction mechanisms used in the 2015/16 auction would be unjust and unreasonable * * * further indicates the unlawfulness of relying solely on the auction's compliance with the then-applicable tariff terms[.]"); J.A. 1054 ("[The Commission] failed to consider whether

The Commission's orders are similarly devoid of explanation as to why the changes to MISO's local clearing requirements dictated in the 2015 Order—that is, the changes to MISO's rules regarding how much capacity had to be generated by power plants physically located within Zone 4—did not equally implicate the justness and reasonableness of the 2015 Auction results. Perhaps, as the Commission and Vistra (Dynegy's successor-in-interest) argue, any flaws in the Zone 4 local clearing requirement would not have affected the fairness of the auction. But that argument depends critically on the assumption that the tariff's mitigation provisions, such as the initial reference level, were functioning properly. The 2015 Order takes the air out of that assumption. *See* 2015 Order ¶¶ 85–92 (J.A. 940–943).

**2**

As the Commission agrees, Section 206 allows a complainant to allege that market manipulation led to unjust and unreasonable rates. *See* Rehearing Order ¶ 14 (J.A. 131–132); Oral Arg. Tr. 35:2–5 (Oral Arg. Rec. 45:38–45:52). Yet the Commission's orders wholly failed to adequately address

---

the tariff provisions governing the auction remained just and reasonable" despite "the Commission's determination in December 2015 that the tariff's provisions were no longer just and reasonable."). The Commission read the filing that same way because it directly responded to the argument that Public Citizen made. *Cf. Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1089 (D.C. Cir. 2021) (finding exhaustion where the Commission's express response "provide[d] strong evidence that the * * * rehearing application put the Commission on notice of the issue"). Public Citizen cannot be blamed for failing to anticipate that the Commission's response would forget the most relevant portions of its own 2015 Order.

Public Citizen's allegation that Dynegy's market manipulation produced unjust and unreasonable results in the 2015 Auction.

Public Citizen's complaint alleged that market manipulation by Dynegy in the form of economic withholding had rendered the 2015 Auction results unjust and unreasonable. J.A. 151–153. Economic withholding is a type of market manipulation in which a utility offers electricity (or capacity) at auction at uncompetitively high prices, which artificially inflates the market-clearing price. *See* ENERGY PRIMER 134 ("Withholding is the removal of supply from the market and is one of the oldest forms of commodities manipulation."). Because Dynegy's acquisition of four new power plants in Zone 4 had made it a pivotal supplier of capacity in that zone, Dynegy seemingly had the power to set the auction clearing price. *See* Commission Br. 50 (acknowledging that Dynegy was a pivotal supplier in the auction); J.A. 145 (Public Citizen alleging that Dynegy is "now the dominant provider of capacity in the zone"). To that point, Dynegy offered some of its capacity in the 2015 Auction at relatively high prices, including 651 MW at $150 per MW-day and 2,775 MW at $167 per MW-day. 2019 Order ¶ 84 (J.A. 105). Public Citizen alleged that Dynegy, asserting its new market dominance, "may have engaged in intentional capacity withholding to drive auction prices from $16.75 to $150.00." J.A. 145.

Addressing this allegation for the first time, the Commission's Rehearing Order said that Public Citizen had "fail[ed] to accurately articulate and address the definition of 'market manipulation'" under the Federal Power Act, and had "not met its burden as a complainant to demonstrate that activity meeting that definition occurred and resulted in rates that are unjust and [un]reasonable." Rehearing Order ¶ 14 (J.A. 131–132).

On this record, that truncated analysis was inadequate.

*First*, Public Citizen more than adequately alleged that conduct during the 2015 Auction met the definition of "market manipulation" and resulted in unjust and unreasonable rates. Public Citizen straightforwardly asserted that "[i]t is illegal for an energy market participant to intentionally withhold economically viable supply from a generating facility for the purpose of inflating prices so it can earn greater profits on sales from other remaining generating assets at the higher price caused by the withholding." J.A. 151–152. For this proposition it cited the Federal Power Act's prohibition on market manipulation, 16 U.S.C. § 824v(a), and the Commission's implementing regulation, 18 C.F.R. § 1c.2(a), which together set out the definition of market manipulation. Public Citizen then cited two other proceedings in which, according to Public Citizen, the Commission had taken the position that "engaging in uneconomic conduct" for the purpose of benefiting an entity's other assets constituted market manipulation. J.A. 152.

For its part, the Commission did not suggest in its orders that economic withholding would not constitute illegal market manipulation. On its face, economic withholding seems to fit within the regulatory definition of market manipulation as including any "scheme * * * to defraud," 18 C.F.R. § 1c.2, where "fraud" includes "any action * * * for the purpose of impairing, obstructing or defeating a well-functioning market[,]" Prohibition of Energy Mkt. Manipulation, 114 FERC ¶ 61,047, at 38–39. To that point, a 2015 Commission staff publication expressly identifies economic withholding as a paradigmatic form of prohibited market manipulation under the Federal Power Act. *See* FERC, ENERGY PRIMER: A HANDBOOK OF ENERGY MARKET BASICS 129–130 (Nov. 2015) (In "[e]conomic withholding * * * the manipulator sets an offer

price for a needed resource that is so high that the resource will not be selected in the market * * * creat[ing] a shortage of generation and * * * rais[ing] prices for the benefit of the rest of its generation fleet or its financial positions."). Under these circumstances, the Commission's unexplained reliance on the "definition" of market manipulation did not answer Public Citizen's core allegation—that Dynegy may have manipulated its auction offers to garner an unreasonably high price.

*Second*, as for meeting its burden of proof, Public Citizen pointed to the significant evidence before the Commission that the auction results were not just and reasonable, and that market power or manipulation could have affected the outcome. To start, the $150 per MW-day auction clearing price, which was 40 times higher than all of the other auction clearing prices in zones where Dynegy lacked such market dominance, should have raised eyebrows. That price was also vastly higher than the Zone 4 clearing prices from prior years. *See* J.A. 63 (clearing price was $16.75 per MW-day in 2014-2015, and $1.05 per MW-day in 2013-2014).

Yet the Commission backhanded the extraordinary price spike with the anodyne statement that "an Auction Clearing Price is not unjust and unreasonable because it is higher than expected." 2019 Order ¶ 84. Okay. But that does not excuse the Commission from grappling with the unusual magnitude of the rate increase and its incongruity with other rates within the same auction. The Commission also ignored the chronological link between the spike and Dynegy's acquisition of pivotal sources of electrical generation within Zone 4. *See* J.A. 144–145, 173; Commission Br. 50; *see also Delaware Div. of Pub. Advocacy v. FERC*, --- F.4th ---, No. 20-1212, 2021 WL 2878597, at *5 (D.C. Cir. July 9, 2021) (Commission acts arbitrarily if it "fail[s] to consider an important aspect of the

problem") (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

On this record, the Commission's generic assertion that "higher" prices alone do not suggest market manipulation misses the mark. The clearing price was not just higher, but was massively higher than the rates in every other zone, and substantial evidence in the record raised the question of a market failure. What this record required was nothing more and nothing less than a reasoned assessment of the evidence as a whole. Yet the Commission did not provide "even the scantest reasoning to support its finding" that the massive price spike in Zone 4 "had nothing to do with market manipulation." 2019 Order (Glick, Commissioner, dissenting) ¶ 5 (J.A. 120).

*Third*, instead of weighing the evidence, the Commission's orders repeatedly asserted that the Zone 4 clearing price was necessarily just and reasonable "because it resulted from the application of MISO's tariff, which had previously been accepted as a just and reasonable approach" to mitigating anticompetitive behavior. 2019 Order ¶ 86 (J.A. 106).

Ah, but "previously been accepted" is exactly the problem. In the same year this auction occurred, the Commission found that the same tariff could no longer produce just and reasonable results. And it did so based in part on empirical grounds that applied just as much to the 2015 Auction as to future auctions. *See* 2015 Order ¶¶ 85–92 (J.A. 940–943).

On top of that, the Commission's breezy analysis overlooks that a market participant could abide by a Transmission Organization's tariff and still manipulate the market to produce an unjust or unreasonable rate, as Commissioner Glick pointed out in dissent. *See* 2019 Order (Glick, Commissioner, dissenting) ¶ 2 (J.A. 117–118); *see also Coaltrain Energy, L.P.*, 155 FERC ¶ 61,204 (May 27, 2016)

(Commission has "repeatedly held [that] [a]n entity need not violate a tariff, rule or regulation to commit fraud."). To put it simply, because the record evidence raised a substantial question of whether the tariff provisions had adequately mitigated exercises of market power or market manipulation in the 2015 Auction, the Commission could not rely reactively on compliance with a hobbled tariff as the lodestar of competitiveness.

That is not to say that an extraordinary price spike necessarily evidences market manipulation or a malfunctioning auction process. The Commission could, on an appropriate record, reasonably conclude that a particular price spike, while unusual, was not unjust or unreasonable. The problem in this case is that the Commission did not do that work. And that failure made its order arbitrary and capricious.

Because the Commission's orders did not adequately explain its conclusion that the 2015 Auction results in Zone 4 were just and reasonable given the evidentiary record and the Commission's own findings in the 2015 Order, we remand to the Commission for further analysis and explanation.

## IV

For all of those reasons, we grant the petition in part and deny it in part, and remand the case to the Commission for further proceedings.

*So ordered.*