# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 17, 2024          Decided July 9, 2024

No. 22-1116

SHELL ENERGY NORTH AMERICA (US), L.P.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CALIFORNIA PUBLIC UTILITIES COMMISSION, ET AL.,
INTERVENORS

———

Consolidated with 22-1121, 22-1153, 22-1154, 22-1155,
22-1156, 22-1157, 22-1159, 22-1167, 22-1168, 22-1169,
22-1182, 22-1207, 22-1211, 22-1212, 22-1213, 22-1243,
22-1250, 22-1259, 22-1263, 22-1265, 22-1298, 22-1299,
22-1304, 22-1305, 22-1306, 22-1307, 22-1319, 22-1322,
22-1323, 22-1324, 22-1325, 23-1008, 23-1011, 23-1012,
23-1013

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Scott H. Angstreich* argued the cause for Seller-Marketer petitioners. With him on the joint briefs were *Paul W. Hughes*, *Neil L. Levy*, *David G. Tewksbury*, *Andrew A. Lyons-Berg*, *David C. Frederick*, *Collin R. White*, *Kenneth W. Irvin*, *Brian P. Morrissey*, *David A. Super*, and *Britt Cass Steckman*. *Vincenzo Franco* entered an appearance.

*Candace J. Morey* argued the cause for CPUC-SCE petitioners. With her on the briefs were *Christine Hammond*, *Jonathan Knapp*, *Angela Wuerth*, *Aaron Jacobs-Smith*, *William Yu*, and *Rebecca Furman*. *Christopher E. Clay*, *Anand Durvasula*, and *Hannah E. Ford-Stille* entered appearances.

*Scott Ray Ediger*, Attorney, Federal Energy Regulatory Commission, argued the causes for respondent. With him on the brief were *Matthew R. Christiansen*, General Counsel, *Robert H. Solomon*, Solicitor, and *Lona T. Perry*, Deputy Solicitor.

*Candace J. Morey* argued the cause for CPUC-SCE intervenors in support of respondent. With her on the brief were *Christine Hammond*, *Aaron Jacobs-Smith*, *Anand Durvasula*, *Hannah Ford-Stille*, *William Yu*, and *Rebecca Furman*. *Jonathan P. Knapp* and *Angela L. Wuerth*, and *Christopher E. Clay* entered appearances.

*Paul W. Hughes* argued the cause for Seller-Marketer intervenors. With him on the joint brief were *David C. Frederick*, *Scott H. Angstreich*, *Collin R. White*, *David G. Tewksbury*, *Neil L. Levy*, *Kenneth W. Irvin*, *Brian P. Morrissey*, *Suedeen Gibbons Kelly*, *John N. Estes III*, *Christopher R. Jones*, *Vincenzo Franco*, *Mark R. Haskell*, and *Brian B. Bell*. *Betsy R. Carr*, *Vernle C. Durocher, Jr.*, *Matthew E. Price*, *Britt C. Steckman*, and *Connor Suozzo* entered appearances.

Before: SRINIVASAN, *Chief Judge*, MILLETT and PILLARD, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

PER CURIAM: This case concerns the sale of electricity under the Federal Power Act, 16 U.S.C. §§ 791a *et seq*, and the Federal Energy Regulatory Commission's ("FERC" or the "Commission") efforts to limit the rates at which certain wholesale electricity is traded.

For over two decades, the Commission has maintained a "soft" price cap for certain short-term electricity sales in parts of the western United States. That soft cap limits the price at which electricity sellers can offer electricity for sale in certain markets and requires "justification and refund" of above-cap sales—sellers who transact at prices above the soft cap must justify those transactions to the Commission or be required to refund sale prices that exceed the cap.

In August 2020, the western United States experienced a heat wave that affected wholesale electricity supply and demand and led to increased prices in the market for short-term electricity supply in that region. Some of the short-term sales occurred at prices above the Commission's soft cap. Sellers who transacted at above-cap prices were thus required to justify those transactions to the Commission.

After reviewing the sellers' justification filings, the Commission determined that some sellers had failed to justify their above-cap sales and ordered partial refunds. As relevant here, the Commission determined that the justification-and-refund inquiry into those above-cap sales did not implicate the *Mobile-Sierra* presumption established in case law. That presumption holds that contract rates formed through arms-

length, bilateral negotiation are entitled to a presumption of reasonableness that the Commission can overcome only by finding that the rate "seriously harms the public interest" or by determining that the conditions underlying the presumption do not apply.

Two groups of petitioners now challenge the Commission's refund orders. One group of petitioners consists of sellers of electricity whose transactions were subject to refund under the soft-cap framework ("Sellers"). Sellers argue, among other things, that the Commission erred by failing to conduct any *Mobile-Sierra* analysis prior to ordering refunds. The other group consists of the California Public Utilities Commission, a state regulatory agency, and Southern California Edison Company, an investor-owned utility ("Consumers"). The Consumers contend that the Commission committed errors in calculating the Sellers' refunds that will lead to higher electricity prices in the future.

We agree with the Sellers that the Commission should have conducted the *Mobile-Sierra* analysis prior to ordering refunds, and so we grant the Sellers' petitions for review, vacate the orders they challenge, and remand for further proceedings. Because of that holding, the Commission necessarily will need to change its refund analysis for above-cap sales going forward, and any decision by this Court on the validity of that framework would be purely advisory. For that reason, we dismiss the Consumers' petitions for review as moot.

5

**I**

**A**

**1**

The Federal Energy Regulatory Commission has "jurisdiction over all facilities" involved in "the transmission of electric energy in interstate commerce and * * * the sale of electric energy at wholesale in interstate commerce[.]" 16 U.S.C. § 824(b)(1).

The Federal Power Act, 16 U.S.C. § 791a *et seq.*, charges the Commission with ensuring that "[a]ll rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy * * * and all rules and regulations affecting or pertaining to such rates or charges [are] just and reasonable," *id.* § 824d(a). As such, the Act empowers the Commission, "upon its own motion or upon complaint," to "fix" any rate or charge subject to its jurisdiction, as well as "any rule, regulation, practice, or contract affecting such rate, charge, or classification" that the Commission finds to be "unjust, unreasonable, unduly discriminatory or preferential[.]" *Id.* § 824e(a).

Commission-regulated public utilities set rates using two different methods. Utilities may "set rates with individual electricity purchasers through bilateral contracts." *Morgan Stanley Cap. Grp. Inc. v. Public Util. Dist. No. 1 of Snohomish County*, 554 U.S. 527, 531 (2008). Alternatively, utilities can "unilaterally set rates, terms, and conditions for service— commonly referred to as tariffs." *Advanced Energy United, Inc. v. FERC*, 82 F.4th 1095, 1100 (D.C. Cir. 2023) (quotation marks omitted); *see* 16 U.S.C. §§ 824d(c), (d). Both tariffs and contracts "must be filed with the Commission before they go

into effect." *Morgan Stanley*, 554 U.S. at 531; *see* 16 U.S.C. §§ 824d(c), (d).

Tariffs take two forms: standard tariffs and market-based tariffs. Standard tariffs list the fixed dollar prices that the utility will charge for units of electricity. *See Public Citizen, Inc. v. FERC*, 7 F.4th 1177, 1184 (D.C. Cir. 2021). The rates in standard tariffs "generally reflect[] the utility's costs plus a reasonable rate of return." *Id.*

Market-based tariffs, by contrast, "do not list any actual prices for electricity, but instead 'simply state that the seller will enter into freely negotiated contracts with purchasers.'" *Public Citizen*, 7 F.4th at 1184 (quoting *Morgan Stanley*, 554 U.S. at 537). Unlike traditional energy contracts, contracts entered into under market-based tariffs need not be filed immediately with the Commission because "the initial filing of the market-based tariffs themselves" satisfies that requirement. *Morgan Stanley*, 554 U.S. at 537. Even so, the "seller must file quarterly reports summarizing the contracts that it has entered into, even extremely short-term contracts." *Id.* With market-based tariffs, "purchasers no longer have the option of buying electricity at a [fixed price] set by tariff and contracts no longer need to be filed with FERC (and subjected to its investigatory power) before going into effect." *Id.* at 538.[1]

---

[1] Not every utility may utilize market-based tariffs for rate setting. The Commission "will grant approval of a market-based tariff only if a utility demonstrates that it lacks or has adequately mitigated market power, lacks the capacity to erect other barriers to entry, and has avoided giving preferences to its affiliates." *Morgan Stanley*, 554 U.S. at 537. Once the Commission has authorized a market-based tariff, the Commission requires large utilities to demonstrate every three years that they still lack or have adequately mitigated market power. *See* 18 C.F.R. § 35.37. If the Commission

Both standard tariffs and market-based tariffs are subject to the filed-rate doctrine.  Under that doctrine, a utility may not charge a rate other than the rate filed with the Commission.  *See West Deptford Energy, LLC v. FERC*, 766 F.3d 10, 12 (D.C. Cir. 2014); *see also Arkansas La. Gas Co. v. Hall*, 453 U.S. 571, 577–578 (1981).  For standard tariffs, the filed rate is the rate set forth in the tariff.  *See Oklahoma Gas & Elec. Co. v. FERC*, 11 F.4th 821, 829 (D.C. Cir. 2021).  For market-based tariffs, the filed rate is generally the market rate, as reflected in each contract.  *See Public Citizen*, 7 F.4th at 1184, 1194.  In both cases, "the filed rate is not limited to 'rates' *per se*, but also extends to matters directly affecting rates."  *Oklahoma Gas & Elec. Co.*, 11 F.4th at 829 (formatting modified).

**2**

We have held that "the Commission's market-based approach is consistent with the Federal Power Act's requirement of 'just and reasonable' rates[.]"  *Public Citizen*, 7 F.4th at 1184.  We have done so because, "in a 'competitive market, where neither buyer nor seller has significant market power, it is rational to assume that the terms of their voluntary exchange are reasonable, and specifically to infer that price is close to marginal cost, such that the seller makes only a normal return on its investment.'"  *Id.* (quoting *Tejas Power Corp. v. FERC*, 908 F.2d 998, 1004 (D.C. Cir. 1990)).

Still, the Commission must fulfill its statutory obligation to ensure that the ultimate rates are just and reasonable.  *See Public Citizen*, 7 F.4th at 1184–1186; *see also* 16 U.S.C.

---

"determines from these filings that a seller has reattained market power, it may revoke the [tariff] prospectively."  *Morgan Stanley*, 554 U.S. at 538.

§ 824d(a). As a result, contracts entered into under market-based tariffs are subject to challenge and Commission review.

The *Mobile-Sierra* doctrine guides the Commission's just-and-reasonable review of market-based-tariff contracts. *See generally United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956); *Federal Power Comm'n v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956). Under that doctrine, the Commission "must presume that the rate set out in a freely negotiated wholesale-energy contract meets the 'just and reasonable' requirement imposed by law." *Morgan Stanley*, 554 U.S. at 530. "Th[at] presumption may be overcome only if FERC concludes that the contract seriously harms the public interest." *Id.*; *see Oklahoma Gas & Elec. Co. v. FERC*, 827 F.3d 75, 76 (D.C. Cir. 2016) ("FERC must presume a contract rate for wholesale energy is just and reasonable and cannot set aside the rate unless it is contrary to the public interest."). "The burden of proving an unjust or unreasonable rate rests with the party that initiated the proceeding—that is, the Commission or the third-party complainant." *Public Citizen*, 7 F.4th at 1183; *see* 16 U.S.C. § 824e(b).

**B**

**1**

The Western Interconnection, which encompasses all or portions of fourteen states, including California, is one of three major regions of the U.S. electric grid. *See U.S. Grid Regions*, EPA, https://perma.cc/F8CC-3D84 (last updated Jan. 15, 2024). For purposes of the orders under review, the Western Interconnection is divided into two footprints: the California Independent System Operator Corporation ("CAISO") region

and the Western Electricity Coordinating Council ("WECC") region.[2]

For more than twenty years, the Commission has imposed conditions on the market-based rate authority of utilities operating in the Western Interconnection. In July 2002, the Commission determined that "the California wholesale electricity market ha[d] be[come] dysfunctional and ha[d] experienced extremely high prices during certain periods." *California Indep. Sys. Operator Corp.*, 100 FERC ¶ 61060, para. 4 (July 17, 2002).

As relevant here, the Commission responded by capping the prices that sellers could offer into CAISO-administered wholesale power markets, as well as the prices of bilateral spot-market transactions in the WECC. *See California Indep. Sys. Operator Corp.*, 100 FERC ¶ 61060, paras. 44–47 (July 17, 2002); J.A. 585.[3] The Commission explained that these caps, together with other mitigation measures, represented "a careful balance of the need to provide incentive for market entry by new generation investment with the need to protect markets from the potential of market power abuse." *California Indep. Sys. Operator Corp.*, 100 FERC ¶ 61060, para. 51 (July 17, 2002).

Three months later, the Commission "clarif[ied]" that these caps were soft caps. *California Indep. Sys. Operator*

---

[2] In this opinion, "WECC" thus refers to the non-CAISO portions of the Western Interconnection, rather than to the regional reliability entity responsible for ensuring reliable electricity in the Western Interconnection. *See* J.A. 584 n.1.

[3] "Spot markets consist of sales that are 24 hours or less in duration and that are entered into the day of or the day prior to delivery." J.A. 584 n.1.

*Corp.*, 101 FERC ¶ 61061, para. 17 (Oct. 11, 2002) ("Soft-Cap Order"). By that, the Commission meant that sellers could "continue to submit bids above the bid cap[,]" but cautioned that "such bids * * * w[ould] be subject to justification and refund." *Id.* For many years, however, the Commission declined to "delineate the specific types of documentation a seller might provide" to justify its above-cap prices, noting that it could not "anticipate all of the possible justifications[.]" *California Indep. Sys. Operator*, 114 FERC ¶ 61135, para. 16 (Feb. 13, 2006); *see Western Elec. Coordinating Council*, 133 FERC ¶ 61026, para. 16 (Oct. 8, 2010) ("As the Commission has stated in the past, we cannot anticipate all of the possible reasons a supplier may exceed the soft cap. Therefore, we decline to predetermine the specific types of documentation a seller might provide."). Instead, the Commission considered justifications "on a case-by-case basis." *California Indep. Sys. Operator*, 114 FERC ¶ 61135, para. 16 (Feb. 13, 2006).

Over time, the Commission has raised the CAISO and WECC caps in parallel. *See Western Elec. Coordinating Council*, 133 FERC ¶ 61026, paras. 2–5 (Oct. 8, 2010). During the period relevant to this case, both caps were set at $1,000 per megawatt-hour. *See id.* para. 15.

**2**

In August and September 2020, a period of "extreme heat * * * significantly affected the demand for and supply of electric generation throughout the Western Interconnection." *Shell Energy North America (US), L.P.*, 179 FERC ¶ 61034, para. 4 (Apr. 22, 2022). As a result of this extreme-heat event, the Sellers made bilaterally negotiated sales that exceeded the $1,000/MWh soft cap. The Commission "posted limited guidance" under which sellers would "be required to justify transactions that exceed the soft price cap in WECC[,]" and it

extended the deadline to file justifications until October 7, 2020. *ConocoPhillips Co.*, 175 FERC ¶ 61226, para. 6 (June 17, 2021).

The Sellers subsequently submitted filings to the Commission to justify their above-cap sales. Each of the Sellers argued that its above-cap sales were justified because the sales were consistent with market conditions at the time of the transactions. Three of the Sellers further argued that the above-cap sales were "the kind of short-term bilateral power sale contracts that both the Supreme Court and the Commission have found are subject to the *Mobile-Sierra* presumption regarding contract modifications." J.A. 162 (footnote omitted) (Shell); *see* J.A. 137 (Tenaska); J.A. 198–200 (Brookfield); *see also* J.A. 166 (Shell Justification Filing arguing that the Commission should find sale prices in excess of the soft cap justified "when they are consistent with prevailing market conditions, including the prices at which analogous products traded on [the Intercontinental Exchange] or on other platforms or markets").

In June 2021, the Commission issued guidance for pending and future soft-cap justification filings ("Guidance Order"). *See ConocoPhillips Co.*, 175 FERC ¶ 61226 (June 17, 2021). The Guidance Order delineated three non-exhaustive frameworks that sellers could use to justify above-cap sales: "(1) a production cost-based framework; (2) an index-based framework; and (3) an opportunity cost-based framework." *Id.* para. 1; *see id.* para. 13 ("[I]n providing this guidance, the Commission does not intend to preclude sellers from seeking to justify their transactions under approaches different from the ones identified.").

After the Commission issued the Guidance Order, the Sellers supplemented their justification filings with additional

information. In these supplemental filings, each Seller argued that the *Mobile-Sierra* presumption applied to their above-cap sales and thus prevented the Commission from ordering refunds absent a finding that the sales were contrary to the public interest. Each Seller also explained that its above-cap sales were consistent with the Commission's index-based framework.[4]

**3**

The Commission subsequently issued orders on each of the Sellers' justification filings. *See* J.A. 584–606 (Shell); J.A. 485–508 (Tenaska); J.A. 899–918 (TransAlta); J.A. 682–706 (Brookfield); J.A. 707–732 (Macquarie). Where the Commission determined that a Seller had identified an appropriate price index, the Commission found that the Seller had justified relevant above-cap sales up to, but not over, that price index. For those sales, the Commission ordered the Seller to refund amounts exceeding the relevant index. Where the Commission determined that a Seller had not identified an appropriate price index, the Commission ordered the Seller to refund all amounts exceeding the soft cap.[5]

---

[4] Under the index-based framework, a seller justifies an above-cap sale by identifying a geographic and temporally relevant weighted average price index that meets the Commission's liquidity standards. *See ConocoPhillips Co.*, 175 FERC ¶ 61226, paras. 20–25 (June 17, 2021).

[5] Although the Commission addressed each Seller's filings in separate orders, the orders are substantially identical as to the issues on appeal. So this opinion, like the Sellers' and the Commission's briefs, cites to the Commission's original and rehearing orders as to Shell Energy. *See* Sellers Opening Br. 11 n.7; Commission Br. 19.

In ordering refunds, the Commission rejected the Sellers' argument that the *Mobile-Sierra* doctrine dictated approval of their contract prices. Although the Commission "agree[d]" that the *Mobile-Sierra* presumption applied to the above-cap sales, it "f[ou]nd that the presumption d[id] not prevent the Commission from enforcing the requirement that sales in excess of the WECC soft price cap must be justified and [we]re subject to refund." *Shell Energy North America (US), L.P.*, 179 FERC ¶ 61034, para. 36 (Apr. 22, 2022); *see id.* (explaining that the fact that the *Mobile-Sierra* presumption applied "[wa]s not dispositive as to the question of whether [the Sellers'] sales that exceeded the WECC soft price cap were justified, or whether the Commission c[ould] order refunds if it f[ound] that the prices for those sales [we]re not justified").

The Commission further reasoned that, in reviewing the Sellers' justification filings, the Commission "[wa]s not modifying the contracts, as would trigger application of the *Mobile-Sierra* presumption[,]" but was instead "enforcing requirements incorporated into the contracts via the Commission orders establishing the price cap and provisions in [the Sellers'] market-based rate tariff[s]." *Shell Energy North America (US), L.P.*, 179 FERC ¶ 61034, para. 36 (Apr. 22, 2022) (footnote omitted). The Commission reasoned that, because the Sellers conducted the above-cap sales pursuant to their market-based authority, the sales were "governed by [the Sellers'] market-based rate tariff and the requirements established therein." *Id.* para 37. Those tariffs stated that each Seller "must comply with 'orders concerning [the] seller's market-based rate authority, including orders in which the Commission authorizes the seller to engage in affiliate sales under th[e] tariff or otherwise restricts or limits the seller's market-based rate authority.'" *Id.* (emphasis omitted). The Commission also concluded that "the WECC soft price cap, which applies to all jurisdictional sellers transacting in the

WECC outside of CAISO, is a restriction or limit on [the Sellers'] market-based rate authority established via Commission orders, as contemplated by [the Sellers'] market-based rate tariff[s]." *Id.* (footnote omitted).

Commissioner Danly dissented from each of the orders. He framed the legal question in each case as "whether the Commission can abrogate a contract to sell electricity pursuant to market-based rate authority when the contract price is above a Commission-imposed 'soft' price cap absent a finding that the public interest so demands." *Shell Energy North America (US), L.P.*, 179 FERC ¶ 61034, para. 1 (Apr. 22, 2022) (Danly, Comm'r, dissenting). Applying the *Mobile-Sierra* doctrine, Commissioner Danly would have answered that question "no." *Id.*

**4**

The Sellers sought rehearing of the refund orders. *See* J.A. 665–681 (Shell); J.A. 755–783 (Tenaska); J.A. 1050–1091 (TransAlta); J.A. 954–977 (Brookfield); J.A. 919–953 (Macquarie).

Because the Commission did not rule on the rehearing petitions within 30 days, each petition was "deemed to have been denied" by operation of law. 16 U.S.C. § 825*l*(a).

Each of the Sellers timely filed petitions for review, and this court consolidated the petitions. With the Sellers' consent, this court subsequently held the petitions in abeyance while the Commission responded to the rehearing petitions.

The Commission subsequently issued orders addressing and rejecting the arguments raised on rehearing ("Final Refund Orders"). *See* J.A. 1191–1213 (Shell); J.A. 1150–1171

(Tenaska); J.A. 1348–1376 (TransAlta); J.A. 1267–1291 (Brookfield); J.A. 1292–1312 (Macquarie); J.A. 1171–1190 (Mercuria). Although the Commission "continue[d] to find that the *Mobile-Sierra* presumption applie[d] to [the Sellers'] contracts," it again found that the "presumption [wa]s not implicated" by the Final Refund Orders. *Shell Energy North America (US), L.P.*, 180 FERC ¶ 61182, para. 8 (Sept. 22, 2022). In reaching this conclusion, the Commission reiterated that the refund directive in the Final Refund Orders did not modify the Sellers' contracts because those "contracts were executed pursuant to the requirements in [the Sellers'] market-based rate tariff[s]," which "incorporate[d] the Commission's orders and 'conditions and requirements' regarding the WECC soft price cap." *Id.* para 16. The Commission also reaffirmed its refund directive for above-cap prices that exceeded the relevant index price.

Commissioner Danly again dissented on the basis that the Commission "failed to properly apply the *Mobile-Sierra* presumption to the contract sales at issue." *Shell Energy North America (US), L.P.*, 180 FERC ¶ 61182, para. 1 (Sept. 22, 2022) (Danly, Comm'r, dissenting); *see id.* ("[The Commission] erred by requiring refunds for the 'premium' amount above the price index that [the Sellers] and the willing buyers freely negotiated absent any showing that the public interest was seriously harmed by the contract rate.").

## II

We have jurisdiction over the Sellers' timely petitions for review of the Commission's final orders under 16 U.S.C. § 825*l*(b). We lack jurisdiction over the Consumers' petitions for review because they are moot.

16

**III**

**A**

The Sellers argue that the Commission's Final Refund Orders violated the *Mobile-Sierra* doctrine because the Commission altered the Sellers' negotiated contract rates without first finding that those rates "seriously harm[ed] the public interest." *Morgan Stanley*, 554 U.S. at 530; *see* Sellers Opening Br. 24–37. We agree.

The *Mobile-Sierra* doctrine has long made clear that the Commission may modify a contracted-for rate "if (but only if) the 'public interest' so requires[.]" *Exxon Corp. v. FERC*, 206 F.3d 47, 49 (D.C. Cir. 2000); *see Gulf States Utils. Co. v. Federal Power Comm'n*, 518 F.2d 450, 452 (D.C. Cir. 1975) (noting the Commission's "power, under § 206(a), to require a rate change not agreed to by the parties" when the Commission can overcome the *Mobile-Sierra* presumption).

There is no dispute in this case that the rates for which FERC ordered refunds were rates for which the Sellers and their customers had mutually contracted in a competitive marketplace. Yet the Commission did not perform any *Mobile-Sierra* public-interest analysis before altering those negotiated rates by ordering the refunds at issue here.

The Commission argues that it had authority to enforce the Soft-Cap Order through refunds without first conducting a *Mobile-Sierra* public-interest analysis because the Soft-Cap Order is part of the Sellers' filed rate. *See* FERC Br. 19–28. The Commission notes that "[a]ll Sellers' market-based rate tariffs contain a provision requiring compliance with 'orders concerning [the] Seller's market-based rate authority, including orders in which the Commission authorizes Seller to

engage in affiliate sales under this Tariff *or otherwise restricts or limits the Seller's market-based rate authority*.'" FERC Br. 21 (quoting *Shell Energy North America (US), L.P.*, 180 FERC ¶ 61182, para. 15 (Sept. 22, 2022)). Drawing on this language, the Commission reasons that, because the Soft-Cap Order limited the Sellers' market-based-rate authority, the Final Refund Orders enforced the filed-rate doctrine by ensuring "that each Seller's contract rates * * * conform[ed] to the terms of its market-based rate tariff, which is the filed rate." FERC Br. 23.

The Commission relatedly argues that its orders did not alter the Sellers' contracts because the contracts themselves incorporated the Soft-Cap Order. *See* FERC Br. 24; *see also* FERC Br. 24 (Commission acknowledging that, if it "were modifying [the] Sellers' contracts, then [it] would need to conduct a *Mobile-Sierra* 'public interest' analysis in support of that modification"). The Commission reasons that the soft-cap framework and the attendant justification-and-refund scheme did not simply require the Sellers to provide documentation and evidence to help to justify their above-cap rates. Instead, the Sellers also had the affirmative burden of convincing the Commission that those rates were justified. When the Sellers failed to do so, the Commission enforced the terms of the Sellers' contracts—"consistent with Sellers' filed rate in the form of their market-based rate tariffs"—by ordering refunds in line with the soft-cap framework. FERC Br. 24.

The Commission's arguments fail for a simple reason: Even assuming that the Soft-Cap Order was incorporated into Sellers' tariffs and contracts, the Commission did not displace the *Mobile-Sierra* presumption in the Soft-Cap Order itself, and so that presumption continues to apply to the Sellers' contracts. More specifically, nothing in the Soft-Cap Order established that the *Mobile-Sierra* doctrine would not apply to

the Commission's review of any above-cap rates. As such, the Soft-Cap Order left intact the Commission's burden of overcoming the presumption that "a freely negotiated wholesale-energy contract meets the 'just and reasonable' requirement imposed by law." *Morgan Stanley*, 554 U.S. at 530. Under the *Mobile-Sierra* doctrine, the Commission can carry that burden only by making a particularized finding that a given contract "seriously harms the public interest[,]" *id.*, even if that contract's price exceeds the soft cap, or can avoid that inquiry by demonstrating that the *Mobile-Sierra* presumption should not apply at all, *see id.* at 553–555. The Commission did not make either determination here.

True, the Soft-Cap Order stated that it was intended to ensure "just and reasonable prices[,]" *California Indep. Sys. Operator Corp.*, 101 FERC ¶ 61061, para. 1 (Oct. 11, 2002), and provided that bids over the soft cap would be "subject to justification and refund[,]" *id.* para. 17. But the mere invocation of the phrases "just and reasonable" and "justification and refund" does not alone suggest that the Commission intended to remove prospectively an entire class of bilateral contracts from the *Mobile-Sierra* framework. Importantly, the soft cap is best viewed as a means of flagging for the Commission contracts that may warrant a public-interest analysis. The requirement that sellers "justif[y]" their above-cap prices, in turn, facilitates this review by obligating sellers to supply information showing that the conditions for the ordinary application of the *Mobile-Sierra* presumption (*e.g.*, the absence of market manipulation) were in place at the time of the above-cap sale.

In short, because the soft cap is best read in this case as functioning in tandem with the *Mobile-Sierra* doctrine, we cannot on this record presume that the Commission meant for its orders to displace the presumption that for nearly seventy

years has been the "default rule" in analyzing the justness and reasonableness of freely negotiated contract rates. *Morgan Stanley*, 554 U.S. at 534.[6]

Since the Soft-Cap Order did not displace the *Mobile-Sierra* framework, the Commission erred by relying on the Soft-Cap Order to issue refunds without first determining that the Sellers' contracted-for rates would "seriously harm[] the public interest[,]" *Morgan Stanley*, 554 U.S. at 530, or that the *Mobile-Sierra* framework does not apply, *see id.* at 553–555. We vacate the Final Refund Orders on this basis, and so we need not reach the Sellers' arbitrary-and-capricious challenges.[7]

**B**

We now turn to the Consumers' challenge. While the Sellers were parties to the Commission's refund orders and challenge the basis for ordering them to pay refunds, the Consumers were not parties to the orders and so are not themselves eligible to obtain refunds. The Consumers instead challenge the Commission's approach to calculating the refunds on the ground that it will lead to higher energy prices.

---

[6] We need not and do not decide whether the Commission *could* prospectively remove a class of freely negotiated, bilateral wholesale-energy contracts from the *Mobile-Sierra* framework and subject those contracts to the type of justification-and-refund scheme the Commission applied here. For present purposes, it is sufficient that the Commission did not express any intent to do so in the Soft-Cap Order.

[7] Because the Soft-Cap Order left the *Mobile-Sierra* presumption in place, the Sellers' petitions were timely filed within sixty days of the refund orders and so were not collateral attacks on the soft-cap framework. *See* 16 U.S.C. § 825*l*(b).

The Consumers intervened in the proceedings before the Commission and sought rehearing of the Commission's orders. They now challenge all thirteen orders in which the Commission permitted sellers to justify above-cap rates.

We have no occasion to engage with the merits of the Consumers' challenge because it is moot. The Consumers' challenge concerns the methodology applied by the Commission in identifying the price index above which the Commission deemed refunds required. Recall that the Commission ordered the payment of refunds for electricity sales made at prices exceeding an appropriate price index identified by a Seller. *See* pp. 12–16, *supra*. The Consumers argue that the Commission's approach when assessing the Sellers' index-based justification was flawed. In the Consumers' view, the Commission should have applied a different approach that would result in a lower price index, which in turn would give rise to greater refunds.

The Consumers' challenge thus turns on the precise way in which the Commission calculated the level of refunds. But as we hold above, the Commission erred in ordering refunds in the first place without applying the *Mobile-Sierra* public-interest analysis. In light of that holding, the Commission can order refunds in the circumstances of these cases only if it first undertakes to determine—and then finds—that the contract rates would "seriously harm[] the public interest" (or that "the premise on which the *Mobile-Sierra* presumption rests" is not present). *Morgan Stanley*, 554 U.S. at 530, 554. Unless and until the Commission engages in the requisite analysis and makes the requisite finding, the precise methodology for calculating any ensuing refunds is an academic question. Indeed, even if the Commission were to apply the *Mobile-Sierra* doctrine to the contract rates—as it now must do before ordering any refunds—and were to determine that the *Mobile-*

21

*Sierra* presumption could be overcome or is inapplicable, there is no reason to assume that the same index-based approach now challenged by the Consumers would then come into play.

Mootness principles dictate that we "may only adjudicate actual, ongoing controversies." *Honig v. Doe*, 484 U.S. 305, 317 (1988). "[F]ederal courts[,]" in other words, "are without authority 'to render advisory opinions or to decide questions that cannot affect the rights of litigants in the case before them[.]'" *Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) (formatting modified) (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)). A challenge becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).

Mootness doctrine thus prevents us from resolving a challenge when "events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc) (quotation marks omitted). That is precisely the situation here with respect to the Consumers' challenge. Our *Mobile-Sierra* holding means that the Commission has not satisfied the preconditions to ordering any refunds, which in turn means that any pronouncement about the correctness of the Commission's index-based justification framework for assessing refunds would not "presently affect the parties' rights" or have a "more-than-speculative chance of affecting them in the future." *Id.* (quotation marks omitted).

22

## IV

For the foregoing reasons, we grant the Sellers' petitions for review, vacate their challenged orders, and remand for further proceedings consistent with this opinion. We dismiss the Consumers' petitions for review as moot.

*So ordered.*